JS-6

**O**

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

DOUGLAS RAYMOND AGGIO
    KEEN,

              Petitioner,

    v.

MARISSA WHITNEY BOWLEY,

              Respondent.

Case No. 8:23-cv-02333-JWH-JDE

**ORDER AND JUDGMENT
GRANTING PETITION FOR THE
RETURN OF BABY A.K.B.K. TO
THE UNITED KINGDOM [ECF
No. 1-1]**

# I.  SUMMARY OF DECISION

This case arises under the Hague Convention's International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001 *et seq.*  The parties are an estranged couple who disagree regarding which country—the United States or the United Kingdom—is the home of their shared child and, by extension, which country's courts will determine their future custody arrangement.

Specifically, Petitioner Douglas Raymond Aggio Keen moves for the return of A.K.B.K. (the "Baby")—his child with Respondent Marissa Whitney Bowley—to the United Kingdom pursuant to ICARA.  Mr. Keen alleges that Ms. Bowley unlawfully retained the Baby in the United States when she failed to return with the child to the U.K. on August 23, 2023.  As the Ninth Circuit has observed, "[t]hese cases are always heart-wrenching, and there is inevitably one party who is crushed by the outcome."  *Holder v. Holder*, 392 F.3d 1009, 1023 (9th Cir. 2004).  In that respect, the instant case is no different.

From a legal perspective, however, the Court's decision is clear:  after considering all papers filed in this action, conducting a three-day evidentiary hearing (the "trial"), and examining all admitted exhibits, the Court finds and concludes that Mr. Keen has met his affirmative burden of proof, but Ms. Bowley has not met her defensive burden.  Ms. Bowley appears to have lied extensively to this Court and to the State Court from which this case was removed.  The Baby was "at home" in London before Ms. Bowley removed him against Mr. Keen's wishes and in violation of Mr. Keen's parental rights under U.K. law.  Therefore, pursuant to ICARA, the Court now **ORDERS** the return of the Baby to the U.K., where the parties will determine an appropriate custody arrangement under U.K. law and under the purview of the U.K. courts.

# II.  BACKGROUND

Mr. Keen is a U.K. citizen.  Ms. Bowley is a U.S. citizen.  The parties met and started dating in London in August 2022.[1]  Much of their tumultuous relationship history

---

[1]      Reporter's Tr. of Proceedings, Trial Day 1, Volume 1 (the "Transcript Day 1 Vol. 1") [ECF No. 47] 17:7-13; *see also infra* Part IV.C.1. (Meeting and First Week of Dating).

is subject to dispute and is discussed in significant detail below.[2]  Ultimately, the parties became parents to the Baby, who was born in London on June 2, 2023.[3]

The parties had planned for Ms. Bowley to take the Baby on a holiday to California in August 2023 to meet friends and family.[4]  The original plan had been for Mr. Keen to join Ms. Bowley and the Baby in Los Angeles after two weeks; the family would then spend an additional two weeks in California before returning together to London. Mr. Keen purchased round-trip tickets for Ms. Bowley and the Baby—they were scheduled to leave London on August 7, 2023, and to return to London on September 4, 2023.[5]

On the night of August 2, 2023, when the Baby was two months old, the parties engaged in a fight during which Ms. Bowley called the London police.[6]  Ms. Bowley told the police that Mr. Keen had strangled her 10 months earlier—in October 2022.[7]  The police arrested Mr. Keen for the alleged October 2022 assault.  He spent the night in custody, and he was released the next day pursuant to certain bail conditions, including a no-contact order with respect to Ms. Bowley (but not the Baby).[8]  The London police ultimately closed the case against Mr. Keen, citing as their rationale a lack of evidence, low risk, and low likelihood Mr. Keen would be convicted.[9]

The day after Mr. Keen was arrested, his U.K. solicitor emailed Ms. Bowley a "Form of Undertaking."[10]  In that email, the solicitor informed Ms. Bowley that Mr. Keen would no longer be travelling to Los Angeles to meet Ms. Bowley and the Baby as planned and that Mr. Keen could not agree that the Baby may remain in Los Angeles until September 4, 2023, because a month would be too long for the Baby and Mr. Keen to be apart.[11]  While "[Mr. Keen] no longer agree[d] to the trip to Los Angeles as previously planned," he offered to allow Ms. Bowley to travel with the Baby to Los Angeles "for the purpose of a holiday from 7 August to 22 August 2023" subject to two

---

[2]    *See infra* Part IV (Findings of Fact).

[3]    Trial Exhibit 4 DK0023 (the Baby's U.K. birth certificate).

[4]    *See infra* Part IV.H.2 (July 2023:  Transient Fights with Threats to Remove the Baby and Plans for Family Travel).

[5]    *Id.*

[6]    *See infra* Part IV.H.3 (August 2, 2023:  Final Altercation and Mr. Keen's Arrest).

[7]    Trial Exhibit 51 MB000867 (London Metropolitan Police Report).

[8]    *Id.* at MB000871-73.

[9]    *See id.* at MB000874-76.

[10]   *See generally* Trial Exhibit 52 (emailed August 3, 2023).

[11]   *Id.* at MB000040.

conditions: (1) that Ms. Bowley "confirm [her] agreement that [the Baby] is habitually resident in England"; and (2) that Ms. Bowley "provide an undertaking to return [the Baby] to London, England on or before 22 August 2023."[12]  The solicitor cautioned that if Ms. Bowley did not "respond providing the two assurances sought above by 4.30pm" that day, then Mr. Keen would cancel Ms. Bowley's flight to Los Angeles and "make an urgent application to the Central Family Court [the next day] for a prohibited steps order preventing [Ms. Bowley] from taking [the Baby] to Los Angeles and seek an order that [Ms. Bowley] pay [Mr. Keen's] costs associated with having to do so."[13]  Finally, the solicitor "urge[d Ms. Bowley] to take legal advice," and she provided Ms. Bowley with the name, website, and contact information for a U.K. family law group called Resolution.[14]

Ms. Bowley signed the "Form of Undertaking" the next day—August 4, 2023.[15] The document states:

> I, Marissa Bowley of Basement Flat, [Street Address], London, W1H 7TP record as follows:
>
> > 1.  [The Baby] was born to me and Douglas Keen on 2 June 2023 in London, England and has always resided in London since that date. Douglas Keen is registered on the birth certificate.
> >
> > 2.  I am travelling with [the Baby] to Los Angeles, United States of America for the purpose of a holiday between 7 and 23 August 2023 only.
>
> I, Marissa Bowley of Basement Flat, [Street Address], London, W1H 7TP undertake as follows:
>
> > 3.  I undertake to return from my holiday in the United States with [the Baby] to Basement Flat, [Street Address], London, W1H 7TP by no later than 23 August 2023.[16]

A box is displayed below that text, which states:

---

[12]   *Id.*

[13]   *Id.*

[14]   *Id.* at MB000041.

[15]   *Id.* at MB000043; *see also* Trial Exhibit 9 (same).

[16]   *Id.*

**Notice pursuant to PD 37A para 2.1:**

You, Marissa Bowley, may be held to be in contempt of court and imprisoned or fined, or your assets may be seized, if you break the promises that have been given to the court.

**Statement pursuant to PD 33A para 2.2(2):**

I understand the undertakings I have given, and that if I break any of my promises to the court I may be sent to prison, or fined, or my assets may be seized for contempt of court.[17]

The document is signed by Ms. Bowley and is dated August 4, 2023.[18]

Ms. Bowley left London with the Baby on August 7, 2023.[19] While in California, Ms. Bowley maintained contact with the London police regarding the criminal case against Mr. Keen. On August 11, 2023, Ms. Bowley told the London police that she "wishe[d] to think about whether she would like to support prosecution [of Mr. Keen], until she return[ed] from her trip in two weeks" and that she had obtained a U.K. solicitor.[20] On August 18, 2023, Ms. Bowley again told the London police that she "has a U.K. based solicitor who will represent her in family court matters regarding [the parties'] child."[21] She also told the London police that she found an Apple AirTag in the Baby's stroller and that she was able to identify it as belonging to Mr. Keen.[22] The police report of that day concluded: "[Ms. Bowley] is due to fly back [to London] on the 23rd of [August]."[23]

But Ms. Bowley did not return to the U.K. with the Baby; the London police report states that she "decided to stay in the U.S." and "informed [Mr. Keen] through his solicitors."[24] On August 22, 2023, Ms. Bowley, on behalf of herself and the Baby, filed in Orange County Superior Court a request for a temporary Domestic Violence

---

[17]  *Id.* (minimal punctuation added for clarity).

[18]  *Id.*

[19]  Respondent's Answer (the "<u>Answer</u>") [ECF No. 13] ¶ 19 (admitted).

[20]  Trial Exhibit 51 MB000872-73.

[21]  *Id.* at MB000873.

[22]  *Id.*

[23]  *Id.*

[24]  *Id.*; *see also* Transcript Day 1 Vol. 1 62:19-21.

Restraining Order ("DVRO") against Mr. Keen.[25]  The same day, the State Court provisionally granted Ms. Bowley's request without argument and set the matter for hearing on September 13, 2023.[26]  Mr. Keen testified at trial that he learned of the DVRO via an email from Ms. Bowley's U.S. attorney on August 23, 2023—the day that she had agreed to return to London with the Baby.[27]

The State Court twice continued the hearing on the DVRO, first because Ms. Bowley had not served the restraining order on Mr. Keen,[28] and second because Mr. Keen asked for more time to prepare.[29]  While the DVRO hearing was pending, the London police closed the case against Mr. Keen for lack of evidence.[30]  The DVRO was ultimately calendared for hearing in the State Court on November 21, 2023.[31]  But that matter was never actually heard; neither Ms. Bowley nor Mr. Keen ever testified in the State Court with respect to the DVRO.[32]

On August 25, 2023—three days after the restraining order against Mr. Keen issued in the State Court and two days after Ms. Bowley was due to return to London with the Baby—Mr. Keen filed an International Child Abduction and Contact Unit ("ICACU") application form with the Central Authority in the United Kingdom, requesting the U.K. Government's assistance in securing the return of then-two-month-old Baby, whom Mr. Keen alleged was wrongfully retained in the United States by his mother, Ms. Bowley.[33]  The U.S. State Department forwarded Mr. Keen's ICACU application to the California Attorney General's Office,[34] which in turn forwarded the application to the Orange County District Attorney's Office.[35]  The State Department also wrote to the State Court Judge directly, notifying him of the pending ICARA action.[36]

---

[25]    *See generally* Trial Exhibit 53 (the "DV-110").

[26]    *Id.*

[27]    Transcript Day 1 Vol. 1 62:22-63:8.

[28]    Trial Exhibit 54.

[29]    Trial Exhibits 55 & 56.

[30]    Trial Exhibit 51 MB000874-76.

[31]    Trial Exhibit 56.

[32]    Transcript Day 1 Vol. 1 64:3-12.

[33]    *See generally* Trial Exhibit 3.

[34]    *See generally* Trial Exhibit 2.

[35]    *See generally* Trial Exhibit 1.

[36]    Trial Exhibit 5.

On October 17, 2023, Mr. Keen filed in the DVRO proceeding in the State Court a motion (1) challenging the State Court's jurisdiction, pursuant to the ICARA action; (2) seeking to quash the DVRO; and (3) seeking to stay the State Court proceeding pending the adjudication of the ICARA matter.[37]  Mr. Keen also filed a custody action in U.K. family court shortly thereafter.[38]  Pursuant to Mr. Keen's ICACU application, the Orange County District Attorney filed this ICARA action in Orange County Superior Court on November 16, 2023.[39]  The next day, the State Court stayed the DVRO action pending the resolution of the instant ICARA matter under the Hague Convention and scheduled the ICARA matter to be heard in a three-day trial beginning on December 18, 2023.[40]

On December 11, 2023—seven days before the trial of the ICARA matter in State Court was set to begin—Ms. Bowley removed this action to this Court, thus commencing the instant case.[41]  Ms. Bowley filed her Answer to the underlying Petition one week later.[42]  This Court conducted an expedited three-day trial on March 25, 26, and 27, 2024.[43]  The parties offered, and the Court admitted, 60 exhibits into evidence, and 11 witnesses testified.[44]  The parties also filed post-trial proposed findings of fact and conclusions of law.[45]

The Baby has remained in Orange County, California, with Ms. Bowley since she removed him from the U.K. in August 2023.  To the Court's knowledge, Mr. Keen has since seen the Baby in person on three visits to Orange County, each time for a few hours per day:  first at the end of December 2023,[46] second at the end of March 2024 after the

---

[37]     Trial Exhibit 14.

[38]     Trial Exhibit 13 (the "C100 Form").

[39]     Notice of Removal Exhibit A—Petition for Return (the "Petition") [ECF No. 1-1].

[40]     Trial Exhibit 59.

[41]     Notice of Removal [ECF No. 1].

[42]     Answer.

[43]     Mins. of Court Trial [ECF Nos. 35, 36 & 38]; *see also Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (The Court must "'use the most expeditious procedures available' to return the child to her habitual residence.").

[44]     List of Exs. & Witnesses (the "Exhibit and Witness List") [ECF No. 40].

[45]     Respondent's Proposed Findings of Fact and Conclusions of Law ("Respondent's Post-Trial Brief") [ECF No. 42]; Pet.'s Proposed Findings of Fact and Conclusions of Law ("Petitioner's Post-Trial Brief") [ECF No. 43].

[46]     Transcript Day 1 Vol. 1 64:22-65:4.

trial concluded,[47] and third in mid-June 2024.[48]  Mr. Keen's sister, Francesca Keen, a British lawyer whose testimony the Court found to be particularly credible, traveled to California with Mr. Keen in December 2023—for what was supposed to be the trial in State Court—and accompanied him during some of his parenting visits.  During that time, she spoke with Ms. Bowley's mother, Maecel Bowley, who indicated that she—Maecel—was caring for the Baby most of the time.[49]

## III.  STATEMENT OF LAW

### A.    ICARA Overview

"The Hague Conference on Private International Law adopted the Hague Convention in 1980 '[t]o address the problem of international child abductions during domestic disputes.'"  *Monasky v. Taglieri*, 589 U.S. 68, 71 (2020) (quoting *Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014)) (alteration in original, internal quotation marks omitted); *see also* Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), Oct. 25, 1980, T. I. A. S. No. 11670, S. Treaty Doc. No. 99-11 (the "Treaty Doc.").  ICARA "implements our Nation's obligations under the [Hague] Convention."  *Monasky*, 589 U.S. at 72.  "It is the [Hague] Convention's core premise that 'the interests of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'"  *Id.* (quoting Hague Convention Preamble, Treaty Doc., at 7). Both the United States and the United Kingdom are signatories.  *See* Hague Conference on Private Int'l Law, Convention of 25 Oct. 1980 on the Civil Aspects of Int'l Child Abduction, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24.

In adjudicating ICARA actions, the Court acts as the fact finder and makes credibility determinations.  *See, e.g.*, *Pennacchia v. Hayes*, 666 F. App'x 677, 679 (9th Cir. 2016) (quoting *Papakosmas v. Papakosmas*, 483 F.3d 617, 622-23 (9th Cir. 2007)).  "[I]f a court finds that a child was wrongfully removed [or retained away] from the child's country of habitual residence, the court ordinarily must order the child's return."  *Golan v. Saada*, 596 U.S. 666, 669 (2022).  "The removal or retention is wrongful if done in violation of the custody laws of the child's habitual residence."  *Monasky*, 589 U.S. at 72. But "a court is not bound to order a child's return if it finds that return would put the

---

[47]    Status Report [ECF No. 41].

[48]    Status Report [ECF No. 61].

[49]    Reporter's Tr. of Proceedings, Trial Day 2, Volume 1 (the "Transcript Day 2 Vol. 1") [ECF No. 48] 73:14-75:6.

child at a grave risk of physical or psychological harm . . . or otherwise in 'an intolerable situation.'" *Monasky*, 589 U.S. at 72 (quoting Art. 13(b), Treaty Doc., at 10; *Golan*, 596 U.S. at 669).

"The [Hague] Convention's return requirement is a 'provisional' remedy that fixes the forum for custody proceedings." *Id.* (quoting Silberman, Interpreting the Hague Abduction Convention: In Search of a Global Jurisprudence, 38 U. C. D. L. Rev. 1049, 1054 (2005)). The adjudication of custody issues proceeds upon the child's return. *See id.*

## B.    Mr. Keen's Pleading Burden

Under ICARA, the Petitioner—Mr. Keen—must "establish by a ***preponderance of the evidence***" that the child was "wrongfully removed or retained within the meaning of the [Hague] Convention." 22 U.S.C. § 9003(e)(1)(a) (emphasis added). To meet that burden, Mr. Keen must prove that (1) the Baby was "habitually resident [in the U.K.] immediately before [his] removal"; (2) the Baby's removal from the U.K. was in breach of Mr. Keen's custody rights under U.K. law; and (3) Mr. Keen actually exercised those rights at the time of Baby's removal. *See* Art. 3, Treaty Doc.

The latter two prongs of the *prima facie* case—that the Baby's removal from the U.K. was in breach of Mr. Keen's rights of custody under U.K. law and that Mr. Keen actually exercised those custody rights at the time of the Baby's removal—are not at issue here.[50] This case turns upon the Court's determination of the Baby's habitual residence at the time of his removal.

## C.    Ms. Bowley's Defensive Burden and Consideration of Ameliorative Measures

If the Petitioner meets his pleading burden, then the Respondent—Ms. Bowley— may nevertheless prevent the Baby's return to the U.K. if she establishes "by ***clear and convincing evidence***" that one of the exceptions set forth in article 13b or 20 of the [Hague] Convention applies." 22 U.S.C. § 9003(e)(2)(a) (emphasis added). The specific exception at issue here requires Ms. Bowley to prove that "there is a grave risk that his . . . return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Art. 13, Treaty Doc. "By providing that a court 'is not bound' to order return upon making a grave-risk finding, Article 13(b) lifts the [Hague]

---

[50]    *See* Answer ¶ 9 ("It is admitted that the Mother and Father share joint rights of custody to the child by operation of law."); *see also* Respondent's Post-Trial Brief ¶ 155 ("The touchstone of this case is the determination of the child's habitual residence."); *see generally id.* (not disputing Mr. Keen's exercise of his custodial rights at the time of removal).

Convention's return requirement, leaving a court with the discretion to grant or deny return." *Golan*, 596 U.S. at 676.

It is similarly within the Court's discretion whether to consider or grant ameliorative measures. *See id.* at 676-77. "A court may therefore decline to consider imposing ameliorative measures where it is clear that they would not work because the risk is so grave," for example where the child would face "an intolerable situation" such as sexual abuse. *Id.* at 680. "Other physical or psychological abuse, serious neglect, and domestic violence in the home may also constitute an obvious grave risk to the child's safety that could not readily be ameliorated." *Id.* "[A] district court reasonably may decline to consider ameliorative measures that have not been raised by the parties, are unworkable, draw the court into determinations properly resolved in custody proceedings, or risk overly prolonging return proceedings." *Id.* at 682.

## IV.  FINDINGS OF FACT

In making its factual findings, the Court considered the papers of record in this action, the trial testimony of the witnesses, and the evidence admitted at trial.

Mr. Keen called the following witnesses (in roughly this order) to testify on his behalf:

- Mr. Keen;
- Mr. Keen's brother, Nicholas Keen;
- the parties' psychological counselor, Dr. Vanessa Ruspoli;
- Francesca Keen's friend, Philippa MacKenzie;
- Mr. Keen's mother, Elaine Keen;
- Mr. Keen's sister, Francesca Keen;
- Ms. Bowley's mother, Maecel Bowley; and
- Ms. Bowley.

Mr. Keen also offered, and the Court considered, the testimony of Jeremy Morley, an expert on U.K. law, by declaration.[51]

Ms. Bowley called the following witnesses (in roughly this order) to testify on her behalf:

- Ms. Bowley's friend, Ejmin Abranosian;

---

[51]    Decl. of Jeremy D. Morley (the "Morley Declaration") [ECF No. 18].

- Ms. Bowley's friend, Stephanie Piza;
- Ms. Bowley; and
- Ms. Bowley's expert witness, Dr. Peter Favaro.[52]

The parties offered, and the Court admitted, 60 exhibits into evidence.[53]  One exhibit—Ms. Bowley's Exhibit 43, the parties' entire WhatsApp message history, consisting of approximately 13,000 messages from August 17, 2022, through August 2, 2023[54]—was particularly useful in providing context and helping the Court to determine the veracity of often conflicting testimony.

## A.    Credibility Determination

In this case, in which the Baby was removed from the U.K. when he was two months old, the law requires the Court to engage in an intensely fact-focused inquiry.[55] The testimony and other evidence presented to the Court can be summarized at a high level as "he said, she said."  As Ms. Bowley's counsel emphasized in closing, in this country, in this Court, "credibility really matters."[56]  Counsel is indeed correct.

After a comprehensive examination of the evidence, the Court did not find Ms. Bowley or Ms. Bowley's witnesses to be credible.  Ms. Bowley's testimony, and the testimony of her witnesses, was not strongly supported—and was frequently contradicted—by the other evidence.  Indeed, Ms. Bowley's own evidence directly contravenes most of her narrative, starting with her account of the earliest days of the parties' relationship.  And while Mr. Keen testified first, Ms. Bowley testified twice, including second-to-last (before only her expert), and she was present in Court throughout the proceedings; Ms. Bowley's testimony was frequently strikingly similar to the testimony of her witnesses, for which Ms. Bowley was present.  Those similarities contribute to the Court's conclusion that much of Ms. Bowley's testimony—and, likewise, the testimony of her witnesses—was fabricated.

Additionally, Ms. Bowley's witnesses were independently unreliable.  For example, Ms. Piza testified that she returned to London shortly after the Baby was born

---

[52]    Exhibit and Witness List.

[53]    *See id.*

[54]    *See generally* Trial Exhibit 43.

[55]    *See infra* Part V.A.1 ("Habitual Residence" is a Fact-Focused Inquiry).

[56]    Reporter's Tr. of Proceedings, Trial Day 3, Volume 2 (the "Transcript Day 3 Vol. 2") [ECF No. 59] 104:23.

because she was in Europe for the summer and London was one of her stops.[57]  With respect to why she stopped in London, Ms. Piza made two seemingly incongruous statements back-to-back:  (1) she "went to go see [Ms. Bowley] because [she] could feel that something was wrong and [she] wanted to meet [the Baby]"; and (2) she did not go to London specifically for Ms. Bowley; rather, she had other friends in London and was already planning to be in London.[58]

Ms. Bowley appears to have contorted and concocted facts from whole cloth to support her overarching thesis that Mr. Keen coerced her, against her will, to stay in London.  The Court can understand the strong incentive to prevaricate in a case that will impact the custody of one's child, but Ms. Bowley's falsehoods extended even to seemingly innocuous events with no bearing on the critical issues in this case.  For example, Ms. Bowley explained that her mother, Maecel,[59] arrived in London the day *after* the Baby was born—instead of beforehand—because of a visa-related miscommunication.[60]  But the Court finds that Maecel arrived on the date that she was originally scheduled to arrive; the Baby simply arrived three days early.[61]  Ms. Bowley also testified falsely regarding the timeline of the parties' first week together.[62]  While the Court understands why Ms. Bowley used her testimony about the first week to support her argument that Mr. Keen coerced her to remain in the U.K.,[63] the first week of the parties' relationship does not bear heavily on the Court's ultimate decision.  Ms. Bowley could have conceded those facts with no detriment to her case.  The Court includes detailed factual findings with respect to the parties' first week because they inform the Court's credibility determinations and Ms. Bowley's ability to work remotely.[64]

In short, in this case Ms. Bowley was prone to fabrications.  In contrast, the Court found Mr. Keen and Mr. Keen's witnesses to be candid and believable, and their testimony was well supported by the documentary evidence.  Therefore, the Court

---

[57]    *See* Reporter's Tr. of Proceedings, Trial Day 2, Volume 2 (the "<u>Transcript Day 2 Vol. 2</u>") [ECF No. 58] 45:19-22.

[58]    *Id.* at 45:22-46:4.

[59]    Throughout this Order, the Court refers to some witnesses by their first names to avoid confusion among family members with the same last name; the Court intends no disrespect.

[60]    *See infra* Part IV.H.1 (June 2023:  The Baby's Birth and Family Vacation on the Coast).

[61]    *Id.*

[62]    *See infra* Part IV.C.1 (Meeting and First Week of Dating).

[63]    *See, e.g.*, Respondent's Post-Trial Brief ¶¶ 12-15.

[64]    *See infra* Part IV.C.1 (Meeting and First Week of Dating).

affords to Mr. Keen's testimony and the testimony of his witnesses[65] greater weight than it affords to Ms. Bowley and her witnesses.

## B.    Preliminary Information

Mr. Keen, a U.K. citizen, owns and operates a luxury travel business based in London.[66]  Mr. Keen resides at Basement Flat, [Street Address], Marylebone, London, W1H 7TP, where he had lived for approximately two years before the events at issue in this case.[67]

Ms. Bowley, a U.S. citizen, works in in the fields of marketing and talent management.[68]  Prior to August 2022, Ms. Bowley lived in Los Angeles,[69] and she has lived in California since she removed the Baby in August 2023.[70]  The parties dispute her country of residence in the interim year.  Mr. Keen considered Ms. Bowley to have been living with him in his London flat.[71]  The Court agrees with Mr. Keen.

It is undisputed that Mr. Keen is the father of the Baby and that he was exercising his rights of custody under U.K. law at the time that Ms. Bowley removed the Baby from the U.K.[72]

## C.    Pre-Pregnancy Events

### 1.    Meeting and First Week of Dating

The parties met in London in August 2022 through a dating app called "Raya."[73]  At the time, Mr. Keen was living in London and Ms. Bowley was visiting the city on vacation.  Ms. Bowley recounted that starting in mid-June 2022 she was abroad, traveling to Greece, Paris, and London with a large group of friends (about 10) and that she was scheduled to return from London to Los Angeles on August 19 or 20, 2022.[74]  Ms. Bowley

---

[65]    Not including Ms. Bowley herself, who testified in both parties' cases in chief.

[66]    Transcript Day 1 Vol. 1 18:18-19:1.

[67]    *Id.* at 14:16-20.

[68]    *See infra* Part IV.I.4.b (Ms. Bowley Was Able to Work and Earn Money in London).

[69]    Transcript Day 2 Vol. 1 95:14-22.

[70]    Answer ¶ 7 ("It is admitted that the Mother and child left the United Kingdom and have remained in California since they departed the United Kingdom").

[71]    Transcript Day 1 Vol. 1 17:3-6.

[72]    *See supra* Part III.B, n.50.

[73]    Transcript Day 1 Vol. 1 17:7-13.

[74]    Transcript Day 2 Vol. 2 109:7-25.

stated that she was able to take a two-plus-month vacation because she "used [her] vacation hours with work."[75]

The parties had their first date on August 17, 2022.[76]  The parties encountered each other through the dating app while they were both in London, and then Mr. Keen messaged Ms. Bowley on Instagram.[77]  Mr. Keen invited Ms. Bowley to dinner, she accepted, and they went out that same night.[78]  The parties went out again the next day to a horse-jumping show.[79]

Ms. Bowley testified that their second date, to the horse-jumping show, was on a Saturday and that during that date Mr. Keen asked her to extend her vacation by one week in order to attend a Coldplay concert with him the next Sunday.[80]  Ms. Bowley explained that she agreed because she was "[j]ust having fun" and she had sufficient vacation days to extend her two-month vacation by an extra week.[81]  Ms. Bowley stated that when she told Mr. Keen that she could not afford a hotel for another week, he offered to, and ultimately did, pay for a hotel for her for four days and that it was Mr. Keen's idea for her to stay at his apartment thereafter.[82]  Ms. Bowley testified that she felt "weird" about staying at Mr. Keen's apartment so soon after meeting him, but "he offered" and "he was offering concerts and shopping" for clothes that she told him she needed.[83]  Ms. Bowley asserted that at the time, she did not consider herself to be living in Mr. Keen's apartment, but "[j]ust visiting on vacation."[84]

But August 17, 2022, was a Wednesday; August 18 was a Thursday; and the next Sunday was August 21.  *See* Fed. R. Evid. 201(b) (permitting the Court to take judicial notice of facts that are "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be

---

[75]     *Id.* at 109:19-21.  The Court doubts this statement since Ms. Bowley also testified that she had recently begun working with Ms. Piza as an influencer talent manager, and Ms. Piza was in the process of "training" her for multiple months.

[76]     Trial Exhibit 43 MB000355.  The Court notes that Trial Exhibit 43 displays date and time stamps in Pacific Standard Time (because the messages were downloaded in California), which is eight hours behind Greenwich Mean Time.

[77]     Transcript Day 2 Vol. 2 108:16-109:6 & 110:2-4.

[78]     *Id.* at 111:11-112:1.

[79]     *Id.* at 112:19-113:16.

[80]     *Id.* at 114:13-23.

[81]     *Id.* at 114:24-115:5.

[82]     *Id.* at 115:8-25.

[83]     Transcript Day 2 Vol. 2 116:1-19.

[84]     *Id.* at 117:1-6.

questioned"). Ms. Bowley's testimony is not supported by the standard calendar or by her own evidence: the parties' WhatsApp messages, which begin on August 17, 2022,[85] establish that the parties attended the horse-jumping show on Saturday, August 20.[86] On that day Mr. Keen told Ms. Bowley that he had "sorted [a] Hotel" for her near his flat "for 2 nights with breakfast included"[87]—not four. And the parties attended the Coldplay concert the next evening—on Sunday night, August 21.[88]

Mr. Keen testified that Ms. Bowley moved into his flat "approximately a week or so after [they] first initially met and went on [their] first date."[89] The evidence supports Mr. Keen's testimony: within a week, Ms. Bowley was staying with Mr. Keen in his flat in Marylebone, London, and she had her own key.[90]

The evidence shows that toward the end of their first week dating, Mr. Keen told Ms. Bowley that he was falling in love with her.[91] Ms. Bowley did not reciprocate initially; at the time, she felt that the relationship was moving uncomfortably fast.[92] But approximately two weeks later, on September 4, 2022, the parties were both enthusiastically professing their mutual love and envisioning a wedding in a castle.[93] The parties exchanged similar messages again two days later, when Ms. Bowley texted Mr. Keen: "Love you so much . . . You're an amazing human . . . Literally everything

---

[85]     Trial Exhibit 43 MB000355.

[86]     *Id.* at MB000361; *see also* https://www.gcglobalchampions.com/en-us/hospitality/2021/hospitality (link embedded in the parties' messages from that day; Mr. Keen sent the link and said, "That's what we are attending later").

[87]     *Id.* at MB000360-361; *see also id.* at MB000364 (Mr. Keen helped Ms. Bowley secure a later checkout time on August 22, 2022).

[88]     *See id.* at MB000362 (Mr. Keen messaged: "Tickets sorted for tonight! . . . Boooooommmm . . . What a Sunday this is going to be . . . Have a listen to them whilst you're getting ready as it's a proper sing along tonight").

[89]     Transcript Day 1 Vol. 1 18:11-14; *see also* Reporter's Tr. of Proceedings, Trial Day 1, Volume 2 (the "Transcript Day 1 Vol. 2") [ECF No. 57] 144:19-23 (confirming to the Court directly).

[90]     Transcript Day 1 Vol. 1 18:11-14; *see also* Trial Exhibit 43 MB000366 (Mr. Keen stated, "I will have a set of keys for you [Ms. Bowley] Wednesday"); *see also* Transcript Day 1 Vol. 2 16:19-21 (Nicholas stated that when he first met Ms. Bowley on August 20, 2022, "[s]he was residing at [his] brother's apartment in London."). *But see* Transcript Day 3 Vol. 2 24:2-10 (Ms. Bowley testified, unconvincingly, that she did not have a key to the flat until "[p]robably . . . November" 2022).

[91]     *See* Trial Exhibit 43 MB000376-77.

[92]     *See id.* at MB000377.

[93]     *See id.* at MB000413.

I've wanted . . . I'm gonna show you what [I] wrote down for what [I] want in someone . . . You're all of it."[94]

## 2.    Keen Family Gatherings

The parties' relationship progressed quickly, as did Ms. Bowley's integration with Mr. Keen's family.

On August 22, 2022, Ms. Bowley attended a dinner with Mr. Keen; his mother, Elaine; and his sister, Francesca, at a restaurant called Nobu to celebrate Elaine's birthday.[95]  Both Elaine and Francesca live in suburbs outside of London.[96]  Ms. Bowley arrived at the restaurant late and explained that she was "working and working on L.A. time."[97]  At dinner, Ms. Bowley told Elaine that she was moving to London "because L.A. [wa]s just getting too dangerous," she "love[d] London, and "she could work anywhere in the world."[98]  To Francesca, Ms. Bowley "indicated . . . that London was always a city she'd wanted to live in" and that while in London she had been "working whilst also spending time with Douglas."  Francesca and Ms. Bowley "bonded over the fact that [they were] both self-employed, and [they each] had the benefit of being able to work from various locations."[99]

With respect to her late arrival to Elaine's birthday dinner, Ms. Bowley testified that she was late to the dinner because she "was hesitant about going because [she] thought it was too soon to meet his mom" and that she was honest with the group about the reason that she was late.[100]

The evidence supports the testimony of Mr. Keen, his mother, and his sister: while Ms. Bowley did message Mr. Keen "[I] haven't met anyone's parents in 7 years, [e]specially after 5 days [crying-laughing emoji] . . . I don't know if I'm ready for that,"[101]

---

[94]     *See id.* at MB000419-20.

[95]     *See* Transcript Day 1 Vol. 1 17:22-18:3 (Mr. Keen's account); Transcript Day 2 Vol. 1 15:24-16:9 (Elaine's account); Transcript Day 2 Vol. 1 60:1-5 (Francesca's account); *see also* Trial Exhibit 43 MB00367 (Mr. Keen and Ms. Bowley discussing having lunch with Elaine and Francesca).

[96]     Transcript Day 2 Vol. 1 15:7-21.

[97]     *Id.* at 16:17-17:2 (Elaine's account); *see also id.* at 60:6-11 (Francesca's account).

[98]     *Id.* at 19:2-9.

[99]     *Id.* at 62:12-19.

[100]    Transcript Day 2 Vol. 2 118:13-119:17.

[101]    Trial Exhibit 43 MB000367 (punctuation added for clarity).

less than an hour later she told him that she could meet his family at the restaurant,[102] but she arrived late and offered work-related excuses.[103]  For example, Ms. Bowley messaged Mr. Keen "I'm on back to back calls right now so [I] don't think I'll make it in time but I'll keep you updated"; then, when the family was already at the restaurant, "Doing a few things on my laptop real quick."[104]

On September 10, 2022, Ms. Bowley attended another Keen family event—a joint birthday party for two of Mr. Keen's young nephews.[105]  Francesca, who hosted the party, testified that Ms. Bowley seemed "[e]xceedingly" happy, "like the cat that got the cream."[106]  At the party, Ms. Bowley told Francesca's friend, Ms. MacKenzie, that she had been shopping and spending time with Mr. Keen and "that she was going to extend her stay because they were in the early stages of their relationship."[107]  Mr. Keen's brother, Nicholas, recalled that Ms. Bowley discussed her ability to work remotely.[108]  Elaine recounted Ms. Bowley stating that she and Mr. Keen "were going to get married in Italy like Francesca had."[109]  That comment "shocked" Elaine, so she made a joke about not wasting time.[110]  Ms. Bowley's reply "stuck in [Elaine's] mind" as "rather alarming":  Elaine testified that Ms. Bowley stated that "it's not often you meet somebody at Douglas's age that doesn't have any baggage and that she wasn't going to let go."[111]

---

[102]     *Id.*

[103]     *Id.* at MB000368.

[104]     *Id.*

[105]     Transcript Day 1 Vol. 2 15:11-16:14 & 17:1-6 (Nicholas's recollection); Transcript Day 2 Vol. 1 9:2-7 (Ms. MacKenzie's recollection).

[106]     Transcript Day 2 Vol. 1 60:21-61:15.

[107]     *Id.* at 9:12-21.

[108]     *See, e.g.*, Transcript Day 1 Vol. 2 17:7-16 (Nicholas testified that Ms. Bowley was working remotely, that she "explained that she was able to work her role virtually, and that she was able to do that from pretty much anywhere in the world.").

[109]     Transcript Day 2 Vol. 1 17:6-25 & 19:15-21.

[110]     *Id.* at 19:22-24.

[111]     *Id.* at 19:25-20:4.

At trial, Ms. Bowley denied conveying to anyone that she wanted to marry Mr. Keen in Italy.[112]  Based upon the Court's credibility determination[113] and the parties' messages about marrying in a castle,[114] the Court credits Elaine's account.

### 3.      Privé Luxury Travel One-Year Anniversary Celebration

On September 15, 2022, Mr. Keen hosted a one-year anniversary celebration for his luxury travel business, Privé Luxury Travel, at a venue called the Apothecary in Mayfair, London.  Ms. Bowley attended the event together with Mr. Keen's clients, family, and friends.[115]  Ms. Bowley stated that as of the date of the Privé party, she did not consider herself to be living with Mr. Keen.[116]  The Court does not find Ms. Bowley's assertion credible.

Mr. Keen testified that, during the time leading up to his work party, he and Ms. Bowley were living together and that they "had lots of conversations" about Ms. Bowley remaining in London instead of returning to Los Angeles:  Ms. Bowley "told [Mr. Keen] time and time again how much she loved London, how much she preferred it to Los Angeles, how much it had always been a dream of hers to live in London, how much safer it was than Los Angeles."[117]

Mr. Keen's family members and friends in attendance testified that, as of the date of the party, they also understood that Ms. Bowley was living with Mr. Keen "in London full time."[118]  Ms. MacKenzie remembered Ms. Bowley telling her that "she had no particular plans to return to the United States of America because she could work [as an influencer manager] anywhere."[119]  Francesca recounted that Ms. Bowley discussed "how she was missing her dog, and that she'd had thoughts that if she were to relocate

---

[112]      *Id.* at 90:22-91:3.

[113]      *See supra* Part IV.A (Credibility Determination).

[114]      Trial Exhibit 43 MB000413.

[115]      Transcript Day 1 Vol. 1 18:15-19:22.

[116]      Transcript Day 2 Vol. 2 120:13-121:15.

[117]      Transcript Day 1 Vol. 1 19:23-20:11.

[118]      Transcript Day 1 Vol. 2 17:17-18:13 (Nicholas); *cf. id.* at 31:1-13 & 32:17-33:4 (Nicholas acknowledged that he thought it "odd" that Ms. Bowley was living with Mr. Keen so soon after meeting and had no plans to return to Los Angeles); *see also* Transcript Day 2 Vol. 1 63:8-15 (Francesca).

[119]      Transcript Day 2 Vol. 1 10:3-24.

how she would get the dog to London without it having to go through quarantine," specifically by bringing the dog into London by way of France.[120]

On cross-examination, Ms. MacKenzie noted that in August 2022, Ms. Bowley had said that her dog was "back at home," which Ms. MacKenzie understood to mean the United States.[121]  Ms. Bowley testified that her dog lived in her apartment in Los Angeles as of October 2022; her mother looked after the dog while Ms. Bowley was traveling.[122]  Ms. Bowley asserted that she never researched or made any arrangements to move the dog to London.[123]

The Court rejects Ms. Bowley's testimony.  In October 2022, while Ms. Bowley was in Los Angeles, she exchanged messages with Elaine about her dog, Ollie.[124]  Elaine asked Ms. Bowley if she had decided to bring the dog to London or to leave him with her mother, Maecel.  Ms. Bowley replied, "I wonder if he'll get jealous of the baby.  I'll bring him over the next time [I] come out here."[125]

The evidence also establishes that Ms. Bowley considered herself to be in a long-term relationship with Mr. Keen at the time of the party.  On September 15, 2022—the date of the party—Ms. Bowley messaged Mr. Keen, apparently unprompted, "Our 1 month was yesterday . . . [heart emoji]," to which Mr. Keen replied, "Here's to the next 10000 months."[126]  Three days later, Ms. Bowley texted Mr. Keen that they would have a cocktail "while [they] plan for 2023 and lay out" on the beach in the Maldives.[127]

### 4.  Trip to the Maldives and Dubai

On September 18, 2022—three days after the Privé party—the parties embarked on their first international trip as a couple.[128]  They spent 12 nights in the Maldives, then an additional five nights in Dubai.[129]  The couple's resort stays were complimentary,

---

[120]   *Id.* at 62:21-63:7.

[121]   *Id.* at 11:24-12:10.

[122]   Reporter's Tr. of Proceedings, Trial Day 3, Volume 1 (the "Transcript Day 3 Vol. 1") [ECF No. 49] 5:12-6:11.

[123]   *Id.* at 6:12-17.

[124]   Trial Exhibit 45 MB000907; *see also* Trial Exhibit 37 DK0225 (showing image of the dog).

[125]   *Id.* at MB000907.

[126]   Trial Exhibit 43 MB000441.

[127]   *Id.* at 444.

[128]   Transcript Day 2 Vol. 2 117:23-25 (Ms. Bowley's account); *see also* Trial Exhibit 43 MB000396 (Mr. Keen texting Ms. Bowley on September 2, 2022, "16 days until the Maldives").

[129]   *See* Transcript Day 1 Vol. 1 20:19-25.

provided by the respective hotels as an incentive for Mr. Keen's business, but Mr. Keen paid the rest of Ms. Bowley's expenses, including her airfare.[130]

Ms. Bowley stated that her experience in the Maldives was "amazing," but she described an incident three or four days into the trip during which Mr. Keen allegedly became "aggressive" in questioning her when he saw her texting with a male friend; she stated that it made her feel "[c]onfused."[131] Ms. Bowley testified that she decided to continue on to Dubai because she "didn't take it too seriously," and her mother told her "Nobody's perfect," "brush it off," and "give him another chance."[132]

Mr. Keen and Ms. Bowley got into a fight toward the end of their first trip to Dubai in October 2022. Mr. Abranosian, Ms. Bowley's friend, happened to be in Dubai at the same time as the parties, and he testified that he witnessed their fight. Mr. Abranosian recounted that Mr. Keen became upset that Ms. Bowley had not thanked him and that Mr. Keen was the instigator of the argument by raising his voice first.[133] Ms. Bowley's testimony mirrored that of Mr. Abranosian, for which she had been present; she stated that Mr. Keen was upset that she had not thanked him and that his reaction made her feel "confused."[134]

In contrast, Mr. Keen testified that "[Ms. Bowley] was very aggressive towards [Mr. Keen], and she stormed off at one point."[135] The evidence supports Mr. Keen's account. The parties' WhatsApp messages show that, on the parties' last night in Dubai, Mr. Keen said something about Ms. Bowley being on her phone, then Ms. Bowley angrily left.[136]

---

[130]     See id. at 21:3-18 & 27:13-15.

[131]     Transcript Day 2 Vol. 2 122:16-123:24.

[132]     Id. at 124:15-125:9.

[133]     Id. at 13:16-15:4.

[134]     Id. at 126:25-127:20.

[135]     Transcript Day 1 Vol. 1 25:14-15.

[136]     See Trial Exhibit 43 MB000461 (Mr. Keen: "Where have you gone? Why are you kicking off over absolutely nothing? I was saying it because I wanted to include you!!!! Not because I'm bothered that you're on your phone." Ms. Bowley: "Haha ok. Good save . . . I don't think you know who you're talking to. I'm telling you right now [I] have zero tolerance for bullshit. Keep trying to play with me." Mr. Keen: "No that's the truth and that's what I was trying to say to you before you stormed off." Ms. Bowley: "Lol . . . Keep doing this. You know the consequences." Mr. Keen: "Babe sometimes I'm in the wrong. . . . But not tonight—I'm being honest." Ms. Bowley: "Lol k . . . You get mad when I'm on my phone. Period. And [I] won't tolerate it anymore.") (punctuation added for clarity).

**D.     Early Pregnancy:  October to December 2022**

The parties returned to London on October 6, 2022, and they learned that Ms. Bowley was pregnant a few days later.[137]

Ms. Bowley testified that she had planned to go "home" to Los Angeles after the trip to Dubai, but that she was stopping in London for about six days because "[Mr. Keen] had already booked the ticket [to London]"; Ms. Bowley claimed that she already had her one-way "ticket to L.A. back" from London.[138]  She stated that, initially, she did not want to return to London from Los Angeles, but her view changed when she learned that she was pregnant.[139]

But the parties' messages indicate that Mr. Keen purchased Ms. Bowley's round-trip flights from London to Los Angeles (and back to London) before the parties learned about the pregnancy.  Based upon the parties' messages, they likely learned of the pregnancy sometime between October 8 and 10, 2022.[140]  On October 6, 2022—the day that the parties left Dubai—Mr. Keen messaged Ms. Bowley:  "maybe have a look at sky scanner for your Los Angeles flights—14th to 27th for you?  Alex [*i.e.*, Mr. Keen's assistant] will look properly on system we use tomorrow but it would be good to have an idea."[141]  Ms. Bowley replied, "I can leave the 15th."[142]  Mr. Keen responded, "Will get Alex to book tomorrow [*i.e.*, October 7, 2022]."[143]

**1.     October 12, 2022:  Announcing the Pregnancy to the Keen Family**

The Keen family celebrated Nicholas's birthday on October 12, 2022.[144]  Before the party, Ms. Bowley and Mr. Keen stopped by Elaine's house to tell Elaine and her

---

[137]     Transcript Day 1 Vol. 1 27:16-28:1.

[138]     Transcript Day 2 Vol. 2 127:21-128:12.

[139]     *Id.* at 130:11-12.

[140]     *See* Trial Exhibit 43 MB000468-69 (Ms. Bowley told Mr. Keen that she thought she was having a miscarriage on October 10, 2022, and Mr. Keen asked her whether she bought "the tests" a few hours later).

[141]     *Id.* at MB000463.

[142]     *Id.*

[143]     *Id.* at MB000464.

[144]     Transcript Day 2 Vol. 1 23:13-15.

husband, Andrew, that they were expecting.[145]  Elaine recalled that Ms. Bowley said that she was "shocked"—despite not using contraception—but "this was what I wanted."[146]

The parties announced the pregnancy to the rest of the family when they arrived at the birthday celebration.[147]  Francesca recalled that Ms. Bowley "was overjoyed" and confirmed that Ms. Bowley was "a hundred percent" planning to undergo prenatal care in London with a British obstetrician, even at that early stage.[148]  Nicholas's recollection was similar:  he testified that he "remember[ed] specifically having a conversation with Marissa and Douglas in regards to living situation"—i.e., whether to remain in Mr. Keen's flat or buy a house in the London area.[149]

## 2.   October 2022:  Trip to California and Move to London

Following Nicholas's birthday party, the parties traveled to Los Angeles: Ms. Bowley flew solo on October 14, 2022, then Mr. Keen joined her.[150]  Ms. Bowley testified that she "didn't want [Mr. Keen] to come [to Los Angeles], but then [she] also did because he was now the father of [her] child."[151]  But the evidence indicates that Ms. Bowley was expressing deep love for Mr. Keen at the time.  For example, on October 14, 2022—the day that Ms. Bowley left London—she messaged Mr. Keen, "I love you . . . Trying not to cry on the plane."[152]  She also wrote Mr. Keen a gushy love letter.[153]  The Court credits Mr. Keen's testimony that the parties "wanted to speak to Marissa's family and announce to them that she was pregnant" and that "[Ms. Bowley] wanted to do that in person, the two of [them]."[154]

---

[145]   *See id.* at 23:16-25.

[146]   *Id.* at 24:1-12; *see also* Trial Exhibit 45 MB000906 (After the party, Elaine messaged Ms. Bowley: "Fabulous and exciting news darling so pleased for you both.  Thanks for coming back to share the news. . . . Xx."  In response, Ms. Bowley noted: "I'm happy it was made with love.").

[147]   Transcript Day 1 Vol. 2 18:14-19:8; *see also* Transcript Day 3 Vol. 1 10:15-23 (Ms. Bowley acknowledging that the parties announced the pregnancy to Mr. Keen's family at Nicholas's birthday in October 2022, before she left London for Los Angeles).

[148]   Transcript Day 2 Vol. 1 63:21-65:11.

[149]   Transcript Day 1 Vol. 2 19:12-23.

[150]   *Id.* at 4:18-5:6.

[151]   Transcript Day 2 Vol. 2 131:9-23.

[152]   Trial Exhibit 43 MB000475.

[153]   Trial Exhibit 31.

[154]   Transcript Day 1 Vol. 1 92:5-12.

### a.   Announcing the Pregnancy to Ms. Bowley's Friends

Ms. Bowley's friend, Mr. Abranosian, testified that when the parties were in California in October 2022, he attended a dinner with the parties and two other friends during which the parties revealed that they were expecting.  Mr. Abranosian testified that he was "upset," "shocked," and "angry"; that aside from saying "congrats" he did not speak until Ms. Bowley asked him to "please say something."  He recalled telling Ms. Bowley that he would miss her because she was leaving California the next day and urging her to stay in California, that "[t]his is too fast."  Mr. Abranosian described that Mr. Keen "stormed the table and left," then returned half an hour later.[155]  Ms. Bowley's trial testimony later in the day largely mirrored that of Mr. Abranosian.[156]

But the parties' messaging history indicates that Ms. Bowley told her friends about the pregnancy, and received the cool reaction that Mr. Abranosian described, before Mr. Keen arrived in Los Angeles.  On October 20, 2022, Ms. Bowley messaged Mr. Keen—who was still in London—that her friends were "[n]ot really" happy about the news, that "[t]hey said they're just in shock but they're happy for me," "[a]nd they're just sad that I'm not gonna be around anymore."[157]  Ms. Bowley then told Mr. Keen, "I wanna be back in London with you already."[158]

### b.   After Mr. Keen Arrived in California, Ms. Bowley Returned Her Car and Moved Out of Her Los Angeles Apartment in Anticipation of Permanently Moving to London

Mr. Keen arrived in California on October 22, 2022.[159]  While Mr. Keen was there with Ms. Bowley, Ms. Bowley returned her leased car to the dealership and moved out of her apartment, and the parties told Ms. Bowley's parents about the pregnancy.

Ms. Bowley testified about returning her car, a Mercedes, on October 26, 2022.  Ms. Bowley appears to have decided not to extend her lease for an additional year, although she had the option to do so.[160]  Ms. Bowley described an incident during which

---

[155]   Transcript Day 2 Vol. 2 15:14-17:15.

[156]   *See id.* at 133:8-134:10.

[157]   Trial Exhibit 43 MB000491; *see also id.* at MB000487 (on October 18, Ms. Bowley messaged Mr. Keen that she "just told" her friend "lil"); Trial Exhibit 45 MB000906-07 (also on October 18, 2022, Ms. Bowley messaged Elaine that her friends were "very happy" when she told them about the pregnancy).

[158]   *Id.* at MB000492.

[159]   *See id.* at MB000494.

[160]   Trial Exhibit 43 MB000368 (Ms. Bowley messaging Mr. Keen: "[I] handled my car situation . . . Good and bad [news] . . . [I] can extend for another year [I] just have to pay $4k.").

Mr. Keen became suspicious and jealous when Ms. Bowley told him not to accompany her to the dealership to return her car.[161]  Mr. Keen's messages indicate that he believed that Ms. Bowley "knew a guy there" and that was why Ms. Bowley was being "strange" about going to the dealership solo.[162]  Ms. Bowley reacted dismissively and told Mr. Keen: "You have issues . . . You're insane . . . F[**]king dreading going to London."[163]  Ms. Bowley explained that the reason that she had not wanted Mr. Keen to accompany her was because she "had to deal with finances."[164]  Mr. Keen testified that "[i]t turned out that [Ms. Bowley] had gotten into financial arrears about [the car], and that was . . . why her behavior was shady."[165]

Also on Wednesday, October 26, 2022, Ms. Bowley appears to have moved out of her Los Angeles apartment with the help of her mother and Mr. Keen.  Ms. Bowley testified that her Los Angeles apartment lease was due to expire in January 2023, and she did not move her belongings out of that apartment during the October 2022 trip to California.[166]  Ms. Bowley's mother, Maecel, also testified that she did not help Ms. Bowley move any items out of the Los Angeles apartment.[167]  But two days earlier—on Monday, October 24, 2022—Ms. Bowley messaged Mr. Keen "Please don't rush me too much.  I'm moving on Wednesday."[168]  The parties' messages on Wednesday, October 26, 2022, indicate that Ms. Bowley was likely packing up her apartment and moving out that day, with the help of her mother and Mr. Keen.[169]

Ms. Bowley testified that, as of the time of the trip to Los Angeles in October 2022, she and Mr. Keen had not yet discussed the plan for the birth; she explained that "[i]t was too early"[170] and "[i]t was still up in the air," since Mr. Keen wanted the Baby

---

161    Transcript Day 3 Vol. 1 7:2-9:2; Trial Exhibit 43 MB000500-01.

162    Trial Exhibit 43 MB000500-01.

163    *Id.*

164    Transcript Day 3 Vol. 1 8:25-9:2.

165    Transcript Day 1 Vol. 1 104:1-6.

166    Transcript Day 3 Vol. 1 16:7-14; *see also* Transcript Day 3 Vol. 1 45:20-46:2 (Ms. Bowley testified that the lease on her Los Angeles apartment expired "several days after" she arrived in California in January 2023, at which point she "moved all [her] things out and put most of them in [her] mom's garage.").

167    Transcript Day 2 Vol. 1 80:7-13.

168    Trial Exhibit 43 MB000498.

169    *See id.* at MB000500 (Ms. Bowley messaged Mr. Keen:  "Can you tell my mom to take [whatever] candles and crystals she wants" and "I just need to pack and get rid of a few more things."  Mr. Keen messaged Ms. Bowley "Do you want me to go down and get the luggage carrier thing?  Or you bring up with you?"  Ms. Bowley replied, "Ya I'll bring it up.").

170    Transcript Day 2 Vol. 2 134:20-23.

to be born in London but Ms. Bowley wanted to give birth in Los Angeles.[171]  Ms. Bowley stated that, before the parties left Los Angeles to return to London, she and Mr. Keen had talked in therapy about coparenting.[172]  And, in support of her argument that she was not moving to London, Ms. Bowley noted that she packed only two medium-sized suitcases for the return flight.[173]

But other evidence shows that Ms. Bowley considered her return to London in October 2022 to be a permanent move—for the duration of her pregnancy and beyond. For example, while Ms. Bowley was in California, she messaged Mr. Keen's mother, Elaine, that she was "looking forward to coming back to London and just settling in."[174] Ms. Bowley also messaged Mr. Keen that they should establish a healthier routine once she "settled in."[175]  In messages to Elaine, Ms. Bowley described her mother's response to the move as "sad . . . but supportive," stating, "[my mother, Maecel, is] even sadder now that I'm pregnant and she won't be there all the time, [b]ut I told her that I'd want her to come to London as often as possible."[176]  And on October 27, 2022, the day after the car-return incident, Ms. Bowley messaged Mr. Keen's mother and sister unprompted to say:  "Just wanted to tell you guys thank you for being amazing and making it easier for me to make the move to London [heart emoji] I'm very lucky to have you guys."[177]

Even Ms. Bowley's family and witnesses acknowledged that Ms. Bowley was moving to London in October 2022.  Maecel testified that she understood that Ms. Bowley was "leaving for London [to live] with Dougie" and that Ms. Bowley told her directly that it was her intention to do so.[178]  Mr. Abranosian also understood that the parties left Los Angeles "to go back to London," where he stated that Ms. Bowley was living with Mr. Keen.[179]  And even if Ms. Bowley's testimony about bringing only two

---

[171]    Transcript Day 3 Vol. 1 15:6-18.

[172]    *Id.* at 14:24-15:2.

[173]    Transcript Day 2 Vol. 1 93:1-12.

[174]    Trial Exhibit 45 MB000907; *see also* Trial Exhibit 37 DK0225.

[175]    Exhibit 43 MB000487; *see also id.* at MB000488 (Ms. Bowley instructed Mr. Keen not to hang certain art in the living room of the London flat, as she "need[ed] a stress free pregnancy," and she did not like the art).

[176]    Trial Exhibit 32 DK0216 (punctuation added for clarity); *see also* Trial Exhibit 37 DK0226 (same, screenshot).

[177]    *Id.* at Trial Exhibit 32 DK0217; *see also* Trial Exhibit 34 (same, screenshot).

[178]    Transcript Day 2 Vol. 1 80:14-21.  *But see id.* at 80:22-81:3 (Mrs. Bowley testified that she understood Ms. Bowley's move to London to be "temporary," but she was not sure about exact dates—"Things were up in the [air].").

[179]    Transcript Day 2 Vol. 2 31:14-22.

suitcases were true—which the Court doubts—the parties' messages repeatedly refer to Ms. Bowley's shopping trips, frequently with Mr. Keen's credit card.[180]

### 3.    November 2022

Ms. Bowley testified that, as soon as the parties returned to London, "[Mr. Keen's] whole personality switched":

> He didn't want to speak to me. . . .  He would ignore me, and he would stay out all day and night.  And when he would come home, I'd try to speak to him, and he just said I don't feel like it.  That went on for the whole pretty much month of November.  I was completely alone and isolated.[181]

Ms. Bowley described that in November 2022, she and Mr. Keen were "not getting along," so she would typically sleep on the couch.[182]

Mr. Keen rejected that assertion.[183]  Mr. Keen stated that the parties were in a relationship and that "[o]n occasion from November to when [the] child was born, if there was an argument, one of [them] would sleep on the sofa."  But Mr. Keen estimated that that happened "maybe . . . on five occasions" over the course of that eight-month period.[184]

The parties' extensive WhatsApp messages simply do not support Ms. Bowley's account.  Mr. Keen was generally an exceptionally doting and supportive partner, constantly checking on Ms. Bowley, professing his love for her, and asking how he could fulfill her needs.[185]  The Court is skeptical of Ms. Bowley's explanation that Mr. Keen was a completely different partner in person than he was over the parties' extensive daily messages.  In addition, the parties commenced couples counseling in mid-November 2022 "to help them communicate better" and "work on their relationship";[186] they had

---

[180]    *See generally* Trial Exhibit 43; *infra* Part IV.J.3 (Alleged Financial Abuse).

[181]    Transcript Day 3 Vol. 1 17:16-21.

[182]    *Id.* at 17:8-14.

[183]    Transcript Day 1 Vol. 2 96:15-98:1 (Mr. Keen was asked, on cross-examination, whether "as early as November 2022," the parties were "living separate lives in [the] apartment when [Ms. Bowley] was there in London," including sleeping separately).

[184]    *Id.* at 97:3-12.

[185]    *See generally* Trial Exhibit 43.  The parties litigated—and the Court addresses in this Order—the relatively few instances where Mr. Keen appears to have behaved jealously.

[186]    Transcript Day 1 Vol. 2 54:17-55:16 (Dr. Ruspoli's testimony).

intimate physical relations on November 22, 2022;[187] and they traveled together to Qatar for the Soccer World Cup at the end of that month.[188]

### a.   November 20, 2022:  Alleged Strangling Incident

Ms. Bowley testified at length about an incident on the night of November 20, 2022, when Mr. Keen allegedly strangled her as she was trying to leave the London flat after an argument.  November 20, 2022, was Ms. Bowley's birthday.[189]  Ms. Bowley was at dinner at a restaurant called Bagatelle in London with two female friends.[190]  The parties argued in their WhatsApp messages; Mr. Keen became upset when he saw another man, Jaydon Gibbs, post on social media from the same restaurant where Ms. Bowley was dining with her friends.[191]  Ms. Bowley replied that she had known Mr. Gibbs for six years and that he had helped her reserve the table at the restaurant. Mr. Keen wrote:

> You're too much. . . .  Every f[***]ing random mixed race kid . . . You do this all the time . . . You're nearly 3 months pregnant and you're out chasing ballers . . . You're going after that life again . . . it's Sunday night and it's 11pm and you're at a club with a load of your type of people.[192]

Mr. Keen then asked if the Baby was his or someone else's.[193]

At trial, Ms. Bowley testified that those messages were "[a]bsolutely" an example of the coercive control that Mr. Keen exerted over her and that she was fearful of responding to Mr. Keen's messages.[194]  She stated that Mr. Keen "always accused [her] of . . . liking other races and [complained] that he wasn't [her] type, and it made him extremely jealous," so she "fe[lt] pressure to make him feel good about himself or to try

---

[187]   Trial Exhibit 43 MB000535-36; *see also* Transcript Day 3 Vol. 2 28:3-25 (Ms. Bowley confirmed that those messages reflect the parties' physical intimacy).  *But cf.* Transcript Day 1 Vol. 2 97:17-98:1 (Mr. Keen acknowledged that that occasion was the last on which the parties were intimate).

[188]   Transcript Day 1 Vol. 2 5:11-12.

[189]   Transcript Day 2 Vol. 2 93:12-16.

[190]   Transcript Day 2 Vol. 2 79:11-80:7.

[191]   Trial Exhibit 43 MB000533; *see also* Transcript Day 2 Vol. 2 81:16-21.

[192]   Trial Exhibit 43 MB000533-34.

[193]   *Id.* at MB000534.

[194]   Transcript Day 2 Vol. 1 104:5-105:8.

to get him to understand that that's not what's going on."  Otherwise "[i]t would escalate . . . [e]motionally [and] physically."[195]

But on WhatsApp, Ms. Bowley did not appear fearful or fawning.  She replied to Mr. Keen:  "[F**k off] . . . You're so insecure.  I can't . . . I'm out . . . That's it . . . F[**]k you . . . Done."[196]  Ms. Bowley blocked Mr. Keen's contact on the app at approximately 11:00 p.m., unblocked him about an hour later, and re-blocked him three hours after that.[197]  During that time, Ms. Bowley alleges that she returned home to the flat— although she did not recall what time[198]—and that Mr. Keen attacked her.

Ms. Bowley testified that she "had to leave [dinner] early because Dougie was upset" and that she was "scared to stay out any longer" because he "was extremely angry."[199]  She stated that when she walked in the front door of the London flat, Mr. Keen screamed at her, "Is the baby even mine?  What is this?  What are you doing?  Who are you meeting up with?"  Mr. Keen allegedly called her "every name in the book."[200]  She stated that Mr. Keen "got extremely aggressive"; she went into the office to pack her bags to leave; Mr. Keen "[s]tormed after [her] and blocked the doorway"; and as she was leaving, "[t]here was a struggle, and [Mr. Keen] eventually strangled [her] and threw [her] to the floor."[201]  Ms. Bowley could not remember whether Mr. Keen used one hand or both.[202]  She testified that she couldn't breathe for "[m]aybe five seconds," but she defended herself by hitting Mr. Keen in the face with her open palm.  After that, she ran with her medium-sized suitcase out the door and up the stairs, and she "jumped at the next taxi available."[203]  Ms. Bowley stated that Mr. Keen tried to follow her but she was able to get into a taxi; she said that the taxi took her to her friends' hotel and that she paid for the taxi with her credit card.[204]

---

[195]   Transcript Day 2 Vol. 2 83:5-19.

[196]   Trial Exhibit 43 MB000534.

[197]   *Id.* at MB000534.

[198]   Transcript Day 2 Vol. 2 80:8-10 & 86:4-5.

[199]   *Id.* at 85:7-13.

[200]   *Id.* at 85:16-21 & 86:10-15.

[201]   *Id.* at 85:21-87:24.

[202]   *Id.* at 88:3-5 ("I believe it was one.  I can't remember.  One or two.  I'm sorry, I think it was both.").

[203]   *Id.* at 88:6-90:3.

[204]   *Id.* at 89:23-90:25.

Ms. Bowley testified that she stayed with her friends in the hotel the following night, November 21, 2022.[205] She stated that her friends were still at the restaurant when she took the taxi to the hotel, so they added her name to the reservation to allow her to enter their room before they returned about 30 to 40 minutes later.[206] Ms. Bowley explained that her friends knew that she had an argument with Mr. Keen, but she was too embarrassed to tell them about the strangling incident because "[t]hat was the first time that ever happened to [her]," she "was humiliated," her friends did not want her to return to London, she "was just in a state of confusion," she was "scared" and "didn't want them involved like that," and she is "a very private person."[207] Ms. Bowley claimed that she did not call the police because she was "processing everything" and "in denial."[208] She recounted that she returned to the London flat the following day, November 22, 2022, because her friends left and because Mr. Keen "was extremely apologetic afterwards," so she thought that she would "stay [in London] and try to make it work" since she "had nowhere else to go."[209]

Ms. Bowley testified that after she returned to the flat, Mr. Keen blamed her for what happened and demanded an apology from her for hitting him in the face, which she refused to do because she "didn't feel like that was [her] fault."[210] Ms. Bowley stated that over the next week, Mr. Keen slept in the bedroom and that she slept in the living room.[211] She described the parties' relationship between November 20 and New Year's Eve 2022 as "[d]istant, extremely distant, just—almost nonexistent."[212]

### b.   The Court Finds that Ms. Bowley Fabricated the Alleged Strangling Incident

Ms. Bowley first reported the alleged November 2022 strangling incident to the London police on August 2, 2023, when Mr. Keen was arrested.  The police report describes the alleged strangling incident as having occurred in October—not November—2022.[213]  At trial, Ms. Bowley testified that she did not know why the police report noted the incident as having occurred in October rather than on her birthday in

---

[205]   Transcript Day 2 Vol. 1 105:17-24.

[206]   Transcript Day 2 Vol. 2 91:1-17.

[207]   *Id.* at 92:6-16.

[208]   *Id.* at 92:17-21.

[209]   *Id.* at 93:24-94:20.

[210]   *Id.* at 94:21-95:5.

[211]   Transcript Day 3 Vol. 1 18:23-19:4.

[212]   *Id.* at 19:10-14.

[213]   Trial Exhibit 51 MB000867.

November 2022, offering, "Maybe I was just under distress and I told him the wrong month.  I'm not quite sure."[214]

In addition to that date discrepancy, Ms. Bowley's description to the police in August 2023 differed from her testimony at trial.  In the police report, Ms. Bowley described that, while she was packing a bag, Mr. Keen "walked towards [her,] grabbed her by the throat with significant pressure causing pain but leaving no visible injuries."[215] Ms. Bowley then, allegedly, "push[ed] [Mr. Keen] back," he "staggered a step," and Ms. Bowley "then pushed [Mr. Keen] in the chest and punched him in the face causing a small bruise to the left eyebrow."[216]  According to the August 2023 police report, body-work video footage was obtained that captured "[Ms. Bowley's] demeanor, initial account, scene, and arrest of [Mr. Keen] for domestic abuse non-fatal strangulation," but that video was not provided to the Court.[217]

The parties' messaging history also undermines Ms. Bowley's account. Ms. Bowley unblocked Mr. Keen again a day and a half after the alleged strangling incident, and the parties resumed their loving conversation, talking about Ms. Bowley coming "home" and snuggling Mr. Keen.[218]  In fact, the parties texted about having intimate relations on November 22, 2022—two days after the alleged strangling incident.[219]  Ms. Bowley confirmed at trial that she and Mr. Keen did, indeed, have intimate physical relations that morning.[220]

Moreover, nothing in the parties' entire WhatsApp message history references any strangling incident, nor any other violence perpetrated by Mr. Keen on Ms. Bowley.[221]  In fact, the only incidents of violence discussed between the parties were perpetrated by

---

[214]    Transcript Day 2 Vol. 2 93:12-23.

[215]    Trial Exhibit 51 MB000867.

[216]    *Id.*

[217]    *See id.* at MB000868.

[218]    Exhibit 43 MB000534.

[219]    *See id.* at MB000535-36.

[220]    *See* Transcript Day 3 Vol. 2 28:3-25.  *But see* Transcript Day 2 Vol. 2 95:6-12 (Ms. Bowley initially testified that the parties had sex for the last time before the alleged strangling incident on her birthday).

[221]    *See generally* Trial Exhibit 43.

Ms. Bowley against Mr. Keen:  Ms. Bowley twice scratched Mr. Keen's face with her nails, drawing blood,[222] and Ms. Bowley threw an iPad at Mr. Keen, hitting his elbow.[223]

Similarly, in the parties' sessions with their psychological counselor, Dr. Ruspoli, they never discussed any violence committed by Mr. Keen against Ms. Bowley,[224] but they did discuss violence by Ms. Bowley against Mr. Keen.  For example, Dr. Ruspoli testified that, in a joint therapy session on November 22, 2022, the parties discussed an incident during which Ms. Bowley physically attacked Mr. Keen:

> Marissa had been out that evening, Dougie suspected she was talking to some other man . . . .  She came back to the flat after her night out.  He got cross with her about that and she attacked him physically.[225]

In sum, the Court does not find Ms. Bowley's testimony about the alleged strangling incident credible.  In fact, the Court finds, based upon the evidence, that Ms. Bowley attacked Mr. Keen on November 20, 2022—not the other way around.

### 4.    Christmas With Both Families in London

The parties celebrated Christmas 2022 together with both of their families in London.[226]  Ms. Bowley's sister, brother, nephew, and niece flew to London and stayed at a nearby hotel; her mother, Maecel, had planned to join but was not able to board the plane because she was traveling on a passport issued by the Philippines and she did not have the proper visa.[227]

---

[222]    *See infra* Part IV.E (January 2023).

[223]    *See infra* Part IV.G (Spring 2023:  House Hunting and Preparing for Baby in London; a Second Temporary Separation); *see also* Trial Exhibit 43 MB000764 (Ms. Bowley acknowledged that she "threw the iPad across the room," and when Mr. Keen stated, "It smashed off my elbow!" Ms. Bowley replied:  "live with it").

[224]    Transcript Day 1 Vol. 2 55:20-56:3 (Dr. Ruspoli testified that Ms. Bowley never reported that Mr. Keen was violent toward her, had attempted to strangle her, or had thrown her on the floor at an event).

[225]    *Id.* at 56:15-21 (punctuation added for clarity); *see also* Transcript Day 1 Vol. 1 32:17-23 (Mr. Keen testified that the first instance he remembered of Ms. Bowley behaving violently toward him was in October or November 2022).

[226]    Transcript Day 1 Vol. 1 37:19-38:3.

[227]    *Id.* at 38:5-11; *see also* Transcript Day 3 Vol. 1 19:20-20:1.

The parties hosted a gender reveal for the families at a restaurant on Christmas Eve;[228] everyone had Christmas lunch together.[229] Mr. Keen testified that he "paid for absolutely everything" because he "wanted it to be special."[230]

Ms. Bowley testified that, by that time, the parties still had not yet agreed upon where the Baby would live after he was born.[231] But Mr. Keen stated that "the main reasoning behind" the combined family Christmas celebration in 2022 was that he "wanted Marissa's family to see where Marissa and the baby were going to be living and how they were going to be living and how she was going to be taken care of, how her life would be in London."[232] And members of the Keen family testified at trial regarding their understanding that Ms. Bowley intended, as of the Christmas holiday, to give birth and to raise the Baby with Mr. Keen in London. Elaine recalled "chitchat[ting]" with Ms. Bowley at the gender reveal regarding goals and daycares, including whether "[the daycare] should be Montessori," and she stated that "[t]here was never any doubt from Marissa's point of view that the baby was going to be born and raised in London. There's no doubt."[233] Similarly, Nicholas emphasized that Ms. Bowley had "[n]ever once" discussed returning to Los Angeles:

> Everything was gearing up to how [the parties] would be living in London, and if not London, just north of London where my brother Douglas and Marissa could potentially move to eventually. But everything was gearing up for the locations being in London. Not once have I ever heard Marissa mention moving back anywhere, with anyone, other than living in London.[234]

Ms. Bowley did not call any of her family to testify. The Court credits Mr. Keen's account.[235]

---

[228]    Transcript Day 1 Vol. 1 38:20-39:15.

[229]    *Id.* at 38:13-16.

[230]    *Id.* at 38:18-19.

[231]    Transcript Day 3 Vol. 1 37:13-16.

[232]    Transcript Day 1 Vol. 1 39:22-40:1. *But see* Transcript Day 2 Vol. 2 54:12-55:15 (Ms. Bowley testified that, as of mid-December 2022, she did "[n]ot really" consider herself a resident of London).

[233]    Transcript Day 2 Vol. 1 30:12-23.

[234]    Transcript Day 1 Vol. 2 20:19-25.

[235]    Trial Exhibit 43 MB000588 (in December 2022, the parties also planned to travel together with the Baby as a family in the future: Mr. Keen discussed booking flights for the parties' upcoming trip to Thailand, but noted that adding a trip to the Philippines would be prohibitively expensive; Ms. Bowley replied, "Ok no prob. We'll take the baby next time . . .

Ms. Bowley alleged that at the gender reveal party, Mr. Keen screamed at his brother, Nicholas, who "started crying and ran outside."[236]  None of the other witnesses who were questioned about the incident corroborated Ms. Bowley's description of the events.  Nicholas recounted a relatively insignificant interaction with his brother: Nicholas stated that Mr. Keen asked for Nicholas's help in quieting the attendees for the gender reveal, that Nicholas dismissed Mr. Keen's request by saying "Let's get on with it," and that Mr. Keen responded by raising his voice.  Nicholas testified that he then left for "maybe 30 seconds," the brothers spoke, Nicholas apologized, and "everything was fine."[237]  Mr. Keen's mother testified that she did not hear Mr. Keen scream at his brother.[238]  And Ms. Bowley's counsel did not cross-examine Francesca at all.[239]  In light of Ms. Bowley's extensive fabrications throughout her testimony, the Court considers her description of Mr. Keen's behavior at the gender reveal to be a gross exaggeration and does not afford it any weight.

## E.     January 2023

### 1.     Travel to Thailand and Dubai

The parties traveled together again after Christmas 2022:  they attended a New Year's Eve party in Dubai, they flew to Thailand on January 1, 2023, for approximately 12 days (including one day in Singapore), then they returned to Dubai for a hotel opening event.[240]  Altogether, they were away from London for approximately a month starting on December 30, 2022.[241]  The parties agree that their relationship had become "toxic" by that point.[242]

The parties returned to Dubai because Mr. Keen's business had been engaged to assist with the opening celebration for a new hotel, Atlantis the Royal—a major event

---

[and] 'Take my mom' aka have her watch the baby . . . Baby can stay in her room.") (punctuation added for clarity).

[236]     Transcript Day 3 Vol. 1 22:5-14.

[237]     Transcript Day 1 Vol. 2 36:3-38:13.

[238]     Transcript Day 2 Vol. 1 56:6-12.

[239]     Transcript Day 2 Vol. 1 75:10-13.

[240]     Transcript Day 1 Vol. 1 40:4-7 & 41:4-13.

[241]     Transcript Day 3 Vol. 1 24:11-25:1.

[242]     *See, e.g.*, Transcript Day 1 Vol. 1 41:14-42:6 (Mr. Keen testified that during their trip to Thailand in January 2023, he and Ms. Bowley "just weren't getting on" and that the relationship "had become very draining"); Transcript Day 3 Vol. 1 41:21-42:8 (Ms. Bowley agreed that the parties' relationship by that point was "[e]xtremely" toxic, and she testified that she would avoid confronting him and try to be agreeable between incidents).

featuring performances by international superstars including Beyonce and Swedish House Mafia.[243]  Mr. Keen recounted that Ms. Bowley was "[j]ust completely volatile" for the entire time that the parties were in Dubai for the hotel opening.[244]  Ms. Bowley, in turn, described the January 2023 trip to Dubai as "upsetting."[245]

Mr. Keen's brother, Nicholas, was also in attendance to support the event.[246]  Nicholas testified that, when he arrived in Dubai on January 19, 2023, "[his] brother was already there with Marissa."[247]  About an hour after he arrived, Nicholas met the parties at a restaurant in the hotel.  Nicholas stated:

> I could already see that something was up.  I witnessed Marissa saying snide comments across the table to my brother.  I witnessed her visibly getting angry with him.  And at that point, I had no understanding of what was the cause of it. . . .  [T]here was a lot of shouting across the table, hand waving, two hands waving, signs of visible frustration coming from Marissa. . . .  [She was b]asically calling him unprofessional and things of that nature.  Saying he was an idiot, behaving like an idiot.[248]

### a.  Imogen-Related Allegations

Ms. Bowley recounted that, in Dubai, Mr. Keen and his brother were "sneaky" and were lying to her "the entire time."  Ms. Bowley testified that Mr. Keen left her alone while he was "off with everyone else but [her]."[249]  During the cross-examination of Mr. Keen, Ms. Bowley's counsel implied that the reason that Ms. Bowley was upset in Dubai in January 2023 was because she learned that Mr. Keen's brother, Nicholas, who is married, was sleeping with another woman, Imogen.[250]  Mr. Keen denied that story as "completely false."[251]

---

243    Transcript Day 1 Vol. 1 42:10-19.

244    *Id.* at 44:10-12.

245    Transcript Day 3 Vol. 1 26:19-20.

246    Transcript Day 1 Vol. 2 22:11-17.

247    *Id.* at 22:24-25.

248    *Id.* at 23:2-15.

249    Transcript Day 3 Vol. 1 28:14-18.

250    Transcript Day 1 Vol. 1 87:20-89:19.  The parties did not reveal Imogen's full name; they consistently referred to Imogen by only her first name.

251    *Id.* at 89:20.

Ms. Bowley testified that the parties traveled to Dubai separately.  When Ms. Bowley arrived, she discovered Mr. Keen in the hotel courtyard with another woman, Imogen.[252]  Ms. Bowley stated that Mr. Keen tried to introduce her to Imogen, but Ms. Bowley left.[253]  The parties' messages provide helpful context.  When Ms. Bowley arrived at the hotel, Mr. Keen told her that he was "speaking to Robbie and Imogen," then, shortly thereafter, he messaged Ms. Bowley:  "Why [are] you being rude? . . . You walked away with your finger up in the air.  Can you come down and us have a nice time please."[254]

The next day, Ms. Bowley confronted Mr. Keen about what she believed was his inappropriate behavior with another woman, likely Imogen, stating:

> I swear to [God] [I] [expletive] catch you being inappropriate again I'm gonna go off.  She's here for work but bringing her friends here?  Wtf is that.  I will go the f[**]k off in front of everyone . . . Stop f[**]king with me.  She's not on holiday.  And you're hanging out with them?  I am livedddd . . . Go up [to the room] right now . . . .[255]

Although Ms. Bowley and her counsel attempted to blame Nicholas's alleged cheating with Imogen for Ms. Bowley's behavior throughout the entire trip to Dubai, Ms. Bowley also testified that on January 21, 2023—the third day of the trip—Mr. Keen let it slip that Nicholas and Imogen were sharing a room.[256]  Days later, Ms. Bowley accused Mr. Keen himself of cheating on her with Imogen.[257]

The Court finds, based upon the evidence, that Ms. Bowley was jealous of Mr. Keen speaking with other women, including Imogen, and that Ms. Bowley fabricated the story about Nicholas sleeping with Imogen as an excuse for her pugnacity.

---

[252]   Transcript Day 3 Vol. 1 26:20-27:10.

[253]   *Id.* at 27:19-22.

[254]   Trial Exhibit 43 MB000617-18 (messages dated January 19, 2023).

[255]   *See id.* at MB000621 (punctuation added for clarity).

[256]   Transcript Day 3 Vol. 1 32:6-33:11 (Ms. Bowley testified that she learned that Nicholas and Imogen were sharing a room the day after Mr. Keen allegedly threw her to the ground).

[257]   Trial Exhibit 43 MB000630 (On January 24, 2023, Ms. Bowley texted Mr. Keen:  "You should go to [Imogen's] house.  You're cheating on me with her.").

### b.      Alleged Throwing-to-the-Ground Incident

Ms. Bowley testified that on January 20, 2023, in a venue called Cloud 22 at the Dubai hotel,[258] she confronted Mr. Keen about why he was not around and why he was not acknowledging her.  Ms. Bowley contended that Mr. Keen told her "to 'F' off and go back to the room," then Mr. Keen grabbed her hard by both wrists and—after a struggle—threw her down to the ground.[259]  Ms. Bowley asserted that she screamed "I'm pregnant," at which point a security guard who had witnessed the end of the altercation appeared.  Ms. Bowley testified that the security guard insisted that Mr. Keen was helping Ms. Bowley to her feet, not throwing her on the floor.[260]  Ms. Bowley stated that, after the altercation, two of Mr. Keen's friends, Robbie and Claudine, saw her "crying and shaking," so they told Ms. Bowley to sit with them, they asked her what was wrong, they hugged her, and they asked a hotel employee for a blanket to comfort her.[261]

Ms. Bowley messaged Mr. Keen's brother, Nicholas:  "Dougie just threw me on the floor."[262]  Ms. Bowley explained that she messaged Nicholas for help because he had told her the night before that he understood that his brother gets angry and that she should feel comfortable confiding in him.[263]  Approximately 30 minutes later, Nicholas messaged "Wtf"; by that time, Ms. Bowley said that she was "[s]itting with Ronan and Robbie" by the bar.[264]

Nicholas testified that before going to Cloud 22, he and the parties had been at a restaurant called Nobu for three or four hours where all three, including Ms. Bowley, consumed shots of sake.[265]  Nicholas stated that Ms. Bowley's message "was very alarming" and out of character for his brother,[266] so Nicholas went to check on Ms. Bowley, who he found sitting and talking with other party guests.  Nicholas related that Ms. Bowley "seemed as normal as she had been the entire weekend."[267]  He recounted that Ms. Bowley did not mention being thrown to the floor, but she pointed to an area on her thigh and asserted that she had already developed a bruise; Nicholas did

---

258    Transcript Day 3 Vol. 1 30:11-15.

259    *Id.* at 28:19-29:15.

260    *Id.* at 29:15-23.

261    *Id.* at 30:6-31:2.

262    Trial Exhibit 44.

263    Transcript Day 3 Vol. 1 31:8-32:3.

264    Trial Exhibit 44.

265    Transcript Day 1 Vol. 2 23:19-24:5.

266    *Id.* at 24:15-17; *see also* Trial Exhibit 44.

267    *Id.* at 24:19-25:24.

see a visible bruise.[268]  Nicholas recalled that Ms. Bowley messaged him the next morning "in great spirits."[269]  On cross-examination about the incident, Nicholas testified:

> She [*i.e.*, Ms. Bowley] seemed absolutely fine.  And what she explained to me didn't add up.  Lots of things [about] Marissa [didn't] add up.  So I chose to pay it little attention, honestly, very little merit, because I didn't believe her . . . And it was another example of many scenarios where she was not acting very well across a weekend that was very important for my brother.[270]

Ms. Bowley explained that she did not report the incident to the police, to hotel security, or to any authorities because the U.A.E. is an Arab country that "favors men" and that she continued to stay in the same hotel room as Mr. Keen because "[t]hat was the only option" since the hotel was so expensive.[271]

The Court does not believe Ms. Bowley's testimony.  Ms. Bowley's behavior after the alleged incident does not comport with that of someone who was assaulted and distraught, and none of the other individuals who was allegedly present—Robbie, Claudine, Ronan, or the hotel security guard—testified at trial nor otherwise offered any evidence to corroborate Ms. Bowley's story.

### c.    First Face-Scratching Incident

The next night, January 21, 2023, the parties did engage in a physical altercation—Ms. Bowley scratched Mr. Keen's face.

According to Ms. Bowley, the parties got into an argument.  She was crying and Mr. Keen was "trying to grab [her]" so she "had to push him away."  Her "hands touched his face" and "left a little scratch."[272]  Ms. Bowley claimed that she was not the aggressor.[273]  Ms. Bowley testified that that incident occurred because Mr. Keen accused her of cheating with a male client with whom she was messaging.[274]

Mr. Keen described the incident differently.  He testified that Ms. Bowley "c[a]me running at [him] and was swinging at [him]," and then, once she got close, she "was

---

[268]    *Id.* at 25:25-26:6.

[269]    *Id.* at 26:12-17.

[270]    *Id.* at 44:8-14.

[271]    Transcript Day 3 Vol. 1 33:12-34:5.

[272]    *Id.* at 34:24-36:9.

[273]    *Id.* at 36:10-12.

[274]    *Id.* at 40:8-41:16.

punching and scratching."[275]  Mr. Keen recounted that on that occasion—as he did "[e]very time that this would happen"—he put his hands out to hold Ms. Bowley's wrists to stop her from hurting him.[276]  The next morning, Nicholas observed Mr. Keen with "deep scratch marks that w[ere] still open in his beard line, just below the beard line."[277]

Sometime after the altercation, the parties exchanged messages that lead the Court to credit Mr. Keen's testimony and to conclude that Ms. Bowley, not Mr. Keen, was the aggressor:

Mr. Keen:  "I don't want you to go back to LA.  I want a healthy relationship."

Ms. Bowley:  "Ya and we don't have it, f[**]k off . . . You're the most toxic person I've ever met, I don't want you in my life."

Mr. Keen:  "You lied to me and I've told you.  You can be a lot of things but just don't lie to me."

Ms. Bowley:  "You're a terrible partner."

Mr. Keen:  "Maybe but I don't lie to your face.  So as I said.  I dramas [*sic*] but just let me know when you want to have a conversation about it."

Ms. Bowley:  "And will probably be a terrible father."

Mr. Keen:  "All[] I ever get told . . . Thanks."

Ms. Bowley:  "I don't need this.  I'll go back to L.A. and enjoy the rest of my pregnancy for once, [s]ince you've ruined this experience for me.  You're not what you think you are.  I'm not even sad about any of it anymore."

Mr. Keen:  "I am.  A lot.  I am desperate for us to be tight.  And we aren't."

Ms. Bowley:  "I can have anyone [I] want.  I don't need to stay and deal with this.  You're desperate for us to be tight but don't put it in the work.  You did this.  You're [*sic*] child is not gonna be with you because of you."

---

[275]   Transcript Day 1 Vol. 1 34:4-6.

[276]   *Id.* at 34:8-18.

[277]   Transcript Day 1 Vol. 2 27:20-25.

> Mr. Keen: "It was definitely me who made you lie to me and it was definitely me who just made you attack me in the room and smash me around the face."
>
> Ms. Bowley: "Lol, Bye."
>
> Mr. Keen: "Let me know when you want to communicate calmly and properly like an adult and then I will be there."
>
> Ms. Bowley: "Enjoy your day. I'll have someone book my flight to L.A. since you're incapable of manning up. I'll go stay somewhere else until [I] leave." [278]

Ms. Bowley then blocked Mr. Keen on her WhatsApp account.[279] Mr. Keen transmitted the following additional message to Ms. Bowley, which she did not receive:[280]

> You need to have half an hour where you reflect, [b]ecause how you just behaved in that room is unacceptable. And imagine if our child saw you screaming and hitting me?! It's got to stop. You talk about me doing the work all the time but what about you and the violent temper you have?! That is on you and only you.[281]

Ms. Bowley unblocked Mr. Keen on the app about 13 hours later.[282]

Despite their dramatic fight, two days later the parties returned to London and, at Ms. Bowley's suggestion, they planned to cook dinner together.[283]

---

[278]   Trial Exhibit 43 MB000624-25 (punctuation added for clarity).

[279]   *Id.* at MB000625; *see also* Trial Exhibit 39 DK0241-42 (depicting part of the same conversation as captured by Mr. Keen in a screen-shot, but excluding the notification about blocking because Mr. Keen had been the one blocked by Ms. Bowley); Transcript Day 3 Vol. 1 104:4-105:5 (Ms. Bowley testifying that Mr. Keen had blocked her in this situation, which the Court concludes is an outright lie); *id.* at 125:2-126:23 (Ms. Bowley testified that she did not respond to the messages Mr. Keen sent while she had blocked him—which Ms. Bowley did not receive because she had blocked him—because she "didn't want to continue the conversation").

[280]   Trial Exhibit 39 DK0242.

[281]   *Id.*

[282]   Trial Exhibit 43 MB000625.

[283]   *See id.* at MB000628.

### 2.  Return to London and Second Face-Scratching Incident

The parties engaged in another physical altercation on the morning of January 24, 2023, that resulted in Mr. Keen "pouring in blood" from his face.[284] Ms. Bowley apparently believed that Mr. Keen was cheating on her with Imogen.[285] Mr. Keen provided a photograph of his wounds.[286] Mr. Keen testified:

> [T]he same thing would happen each time. . . .  [S]he'd run at 100 miles an hour at me, [l]iterally just running and swinging and like punching. . . .  I would normally . . . cower up against the wall or up against the door most of the time when these occasions happened.  Or if I could manage to get her wrist to stop her, then I would.  But on occasion of the 24th of January, she was punching and scratching everything.[287]

After the incident, Ms. Bowley expressed remorse:  "Can you go to the pharmacy and see if they have Neosporin for your face . . . I feel so bad.  I couldn't even look at you."[288]  The parties discussed the violence again a few days later—Mr. Keen appeared to be embarrassed by the scratches on his face.[289]  Mr. Keen recounted that the parties disclosed the incident to Dr. Ruspoli in a therapy session, and Ms. Bowley acknowledged her behavior.[290]

### F.  Ms. Bowley's Winter 2023 Stay in California:  A Temporary Separation

On January 26, 2023, two days after the parties returned to London from Dubai, Ms. Bowley left for Los Angeles.[291]  Ms. Bowley testified that her return to London was merely a two-day stopover on her way to Los Angeles[292] and that she was "planning on staying" at her mother's house in Orange County.[293]  But Mr. Keen testified that the

---

[284]   *See id.* at MB000630.

[285]   *See id.* at MB000630 (Ms. Bowley texted Mr. Keen: "Go to Imogene [*sic*] house . . . You should go to her house. You're cheating on me with her.").

[286]   Trial Exhibit 40; Trial Exhibit 39 DK0244; *see also* Trial Exhibit 43 MB000630.

[287]   Transcript Day 1 Vol. 2 142:13-143:19.

[288]   Trial Exhibit 43 MB000637; *see also* Transcript Day 3 Vol. 2 13:15-21 (Ms. Bowley admitting that she was referring to the scratch that she created on Mr. Keen's face); *See id.* at 30:22-31:12.

[289]   Trial Exhibit 43 MB000643.

[290]   Transcript Day 1 Vol. 1 46:15-20.

[291]   *See id.* at 47:12-13; Transcript Day 1 Vol. 2 87:2-11.

[292]   Transcript Day 3 Vol. 1 36:21-37:12.

[293]   *Id.* at 46:17-20.

reason that Ms. Bowley traveled to Los Angeles was that after the January 24, 2023, incident—when Ms. Bowley scratched his face for a second time—Mr. Keen told Ms. Bowley and her mother that Ms. Bowley's violence "ha[d] become a normal pattern of behavior . . . [and] seem[ed] to be completely acceptable to Marissa"; he told the women that "[Ms. Bowley] need[ed] to return to L.A., and she need[ed] to seek therapy" before the Baby's birth.[294]  The evidence supports Mr. Keen's account:  after the second face-scratching incident, Ms. Bowley asked Mr. Keen to book her a flight "home" to Los Angeles,[295] so Mr. Keen reached out to Jack[296] to arrange Ms. Bowley's flight.[297]

Ms. Bowley testified that as of January 26, 2023, she "knew that she wanted to have [her] baby in L.A."[298]  And the day after the second face-scratching incident, Ms. Bowley did appear to tell Mr. Keen that their relationship was over.[299]  But mere hours later, Ms. Bowley backed down, communicating instead that she needed to feel more love and affection from Mr. Keen.[300]  And the next day—January 26, 2023—Ms. Bowley confirmed that she planned to return to London.  After Ms. Bowley began her journey to Los Angeles, Mr. Keen told Ms. Bowley:  "You packed too much.  That made me upset . . . Made me feel like you weren't coming back or you were going for too long."[301]  Ms. Bowley replied:  "Well it was a thought . . . Just focus on work.  Don't worry about me.  I'm coming back . . . We'll see each other soon. . . . This will be good for

---

[294]    *Id.* at 47:6-11.

[295]    Exhibit 43 MB000630-31; *see also* Trial Exhibit 39 DK0243-45.

[296]    While the parties dated, Mr. Keen paid for Ms. Bowley's flights by way of his friend Jack. Mr. Keen paid £1400 for Jack—an airline employee—to name Ms. Bowley as the recipient of his reduced-rate, standby, concession tickets.  Transcript Day 1 Vol. 2 8:11-10:10; Transcript Day 3 Vol. 1 43:15-45:19.

[297]    Trial Exhibit 43 MB000630 (Mr. Keen stated that Jack told him, "No problem Dougie at all!!  Yes of course, send across the money and I'll get her added straight on. . . And get a group message set up and I will book whenever you want to fly and I will check the loads for the best availability with upper class etc!!!"); *id.* at MB000631 (discussing flight options); *id.* at MB000633 (purchasing the flight on January 25).

[298]    Transcript Day 3 Vol. 1 50:5-7.

[299]    Trial Exhibit 43 MB000631-32 (Ms. Bowley messaged Mr. Keen: "I'm not raising my child in a home with someone who won't talk to me . . . This is all too late . . . You [Mr. Keen] let it get to this point . . . I've been begging for your love and attention for months and you didn't give it to me . . . We can figure out how to co parent.  I'm not going to keep you away from [the Baby].").

[300]    *Id.* at MB000634-35 ("I've just felt like you . . . don't want me anymore . . . I have to remove myself from the situation right now because I'm not being treated right . . . A woman has to be treated right in order for her to be feminine and nurturing and caring . . . I've had zero love from you.").

[301]    *Id.* at MB000637.

us and we'll see each other in no time."[302]  Shortly thereafter, Ms. Bowley messaged Mr. Keen:  "I miss you [sad face].  I'm still crying . . . You're more than [I] could've asked for [heart].  And I'm very lucky to have you."[303]

When questioned about her intentions with respect to those messages, Ms. Bowley stated that she was "very emotional and back and forth."[304]  Ms. Bowley explained that later, when she was in California without Mr. Keen, she let him know that her "plan was not to come back [to London]" and that the parties discussed that plan in therapy.[305]

On February 10, 2023, while Ms. Bowley was in Los Angeles, Ms. Bowley again accused Mr. Keen of inappropriate behavior.[306]  That issue—apparently over Mr. Keen's "likes" on Instagram—devolved into Ms. Bowley refusing to speak with Mr. Keen; repeatedly blocking and unblocking Mr. Keen; calling Mr. Keen a "gaslighter," a "cheater," a "liar," and a "narcissist"; and ultimately requesting that Mr. Keen send her a "note of how [he] would like to co-parent, [a] plan of action with [Ms. Bowley] living here in L.A."[307]  Ms. Bowley told Mr. Keen that she wanted to give birth at Cedar Sinai Hospital in Los Angeles (to which Mr. Keen objected that that option "wasn't what [they] had agreed" and that he would not pay for the Baby's birth there), that Mr. Keen could visit when the Baby was born, and that she wanted to figure out what to do with her belongings that she left in the flat in London.[308]  Over the next few days, Ms. Bowley continued to insist that the parties were no longer in a relationship.[309]  Ms. Bowley testified that, as of February 2023, "[she] and the baby were supposed to be in L.A. after he was born."[310]

At the time, Mr. Keen appeared to accept Ms. Bowley's decision; he told her that he "[h]op[ed] [she] w[ould] be in London to have the baby as [he had] sorted [their] first day away from the baby as a couple on [their] own, a month after the baby [would be]

---

302     *Id.* (punctuation added for clarity).

303     *Id.* at MB000638 (punctuation added for clarity).

304     Transcript Day 3 Vol. 2 29:4-30:21.

305     *Id.*

306     Trial Exhibit 43 MB000667-68 (Ms. Bowley accused Mr. Keen of "liking" and commenting "heart eyes" on another woman's photos; Mr. Keen responded that he comments that on everyone's photos, male and female).

307     *See id.* at MB000668-72 (punctuation added for clarity).

308     *Id.* at MB000673.

309     *See id.* at MB000673-79.

310     Transcript Day 3 Vol. 1 39:8-14.

born."[311]  And Dr. Ruspoli testified that, as of their February 22 and 23, 2023, sessions, she considered the parties no longer to be a couple, and they were discussing co-parenting strategies.[312]

Ms. Bowley testified that, because Mr. Keen refused to pay for the Baby to be born in Los Angeles, she had no choice, so she finally agreed to give birth in London.[313]  And when pressed about whether he declined to pay for the Baby to be born in California, Mr. Keen stated:  "In February 2023, [when] Marissa said I want to have the baby at Cedar-Sinai in Los Angeles[, ] I said I have already paid 50 percent with the obstetrician in the U.K.  I'm not prepared to pay for an obstetrician in the U.S. when we were so far down with amazing treatment with our obstetrician."[314]

But as of March 3, 2023, Mr. Keen appeared to accept Ms. Bowley's stated decision to have the Baby in Los Angeles, but he wondered whether the parties should undertake a "pros and cons" analysis before finalizing the decision; Ms. Bowley agreed to do so.[315]  Mr. Keen described that the parties "had conversations on multiple occasions about birth, and [they] both thought that the best care for [their] child was going to be the same obstetrician . . . as the royal family" in London.[316]

Ultimately, Ms. Bowley returned to the parties' shared flat, unaccompanied,[317] and the parties reengaged in planning their future as a family in London.  Even if at some point in Winter 2023 the parties had separated and at that point did not plan to raise the Baby together in London, they reunited and readopted that plan soon thereafter.

---

[311]    Trial Exhibit 43 MB000680; *see also id.* at MB000693 (discussing whether the parties should do "the pros and cons of both places [London and LA] for [the birth]" or whether Ms. Bowley "just want[ed] to have [the Baby] in LA"; Ms. Bowley stated "We can do the pros and cons").

[312]    Transcript Day 1 Vol. 2 69:23-73:13; *see also* Trial Exhibit 63 40 & 48.

[313]    Transcript Day 3 Vol. 1 51:9-14; *see also* Transcript Day 2 Vol. 1 97:9-24 (Ms. Bowley testified that she was coerced to return to London in March 2023).

[314]    Transcript Day 1 Vol. 1 102:18-23.

[315]    Trial Exhibit 43 MB000693 (Ms. Bowley told Mr. Keen, "We also need to let your family know so they can plan to come here [to Los Angeles] when the baby is born if they want to."  Mr. Keen responded, "So we aren't doing the pros and cons of both places for where the baby is born?  You just want to have it in L.A.?"  Ms. Bowley replied, "We can do the pros and cons ya.").

[316]    Transcript Day 1 Vol. 1 102:11-14.

[317]    *Id.* at 48:3-16; Transcript Day 2 Vol. 1 84:1-9 & 96:25-97:8.

G.      **Spring 2023:  House Hunting and Preparing for Baby in London; a Second Temporary Separation**

With respect to her return to London, Ms. Bowley testified:  "There was no plan to live in England.  There was no plan to work in England.  There was no plan for the baby to stay in England after the birth.  There was no plan to stay longer than I needed to after the birth."[318]  The Court concludes that—even if Ms. Bowley did not plan to remain in London after the Baby's birth as of the time she returned to London in March 2023—by the end of that month she planned to remain in London permanently.

For example, Ms. Bowley testified that she, personally, was never looking for a long-term home in London; that she did not have any plans to purchase a home in London; and that the parties did not have any plans to purchase a home in London together.[319]  But the record indicates otherwise.  Mr. Keen testified:  "Both Marissa and I spent a lot of time looking on Rightmove, which is a realty . . . .  We both spent a lot of time looking at that and viewing properties.  Marissa's wish was that she wanted to remain in Central London for the time being."[320]  And indeed, on March 29, 2023, the parties exchanged what appear to be links to listings of houses for sale in the London area:  Mr. Keen sent Ms. Bowley a listing on Rightmove.co.uk for a four-bedroom house in St. Albans (a London suburb), and Ms. Bowley sent Mr. Keen two listings on Rightmove, one of which was a three-bedroom apartment in London.[321]  In April 2023, the parties viewed a property in St. Albans, but they "decided that property wasn't going to be viable for two or three reasons."[322]

---

[318]      Transcript Day 3 Vol. 1 51:18-21; *see also* Transcript Day 2 Vol. 2 19:7-21 (Ms. Bowley's witness, Mr. Abranosian, stated that he eventually learned that Ms. Bowley would return to London to have the Baby, but he understood that she and the Baby would return to Los Angeles afterwards).

[319]      Transcript Day 3 Vol. 1 116:2-16.

[320]      Transcript Day 1 Vol. 1 52:20-25.

[321]      Trial Exhibit 43 MB000719 (https://www.rightmove.co.uk/properties/132842258#/?channel=RES_LET, which Ms. Bowley sent to Mr. Keen, links to a listing for a "long term" let of a three-bedroom apartment on Robert Adam Street, London, W1U); *see also* Transcript Day 3 Vol. 2 23:12-17 (Ms. Bowley testified that the London flat they shared was approximately 700 square feet and had two bedrooms, one of which was the office).

[322]      Transcript Day 1 Vol. 1 53:1-15; *see also* Transcript Day 2 Vol. 1 30:24-31:12 (Elaine recalled that Ms. Bowley "she said she wanted the baby to have a garden," and the two women discussed that it would be easier for the parties to be near the Keen family outside of London "for babysitting purposes."  So Elaine found a property in St. Albans, and the parties went to see it after they left a family gathering in Spring 2023.).

In April 2023, Ms. Bowley traveled solo to New York for approximately three nights for her work, which included meetings with her business partner, Ms. Piza, and a New York-based brand.[323] While she was in New York, Ms. Bowley sent messages to Mr. Keen that evinced her commitment to live permanently with him as a family after the Baby's birth.[324] Ms. Bowley also attempted to make friends in London, including making plans to meet with other mothers whom she met on a parenting networking app.[325] And in early May 2023, Ms. Bowley sent messages to Mr. Keen referring to herself as his "8 month pregnant [girlfriend]" and confirming that she "left everything and everyone [in California] so [she and Mr. Keen] c[ould] be a family."[326]

On May 3, 2023—approximately a month before the Baby was born—the parties had a two-hour appointment at a department store called John Lewis to test out baby products.[327] They purchased "everything" that day.[328] The baby items—including "push chairs, car mirrors, literally everything you really could think of"—were delivered to Mr. Keen's London flat over the ensuing weeks.[329] Mr. Keen testified that he spent approximately £5,000 on those baby items and that Ms. Bowley did not contribute to that expense.[330]

The parties began arguing again after their shopping trip to John Lewis.[331] Ms. Bowley testified that Mr. Keen "had given [her] $200 before he was leaving for his eight-day trip," then "asked for that money back."[332] The evidence indicates that

---

[323]    Transcript Day 1 Vol. 1 49:11-25; Transcript Day 3 Vol. 1 54:4-55:12.

[324]    *See, e.g.*, Trial Exhibit 43 MB000742 (Ms. Bowley messaged Mr. Keen: "Can we move here [to New York]? . . . All the moms are so cool."); *id.* at MB000744 (Mr. Keen told Ms. Bowley that he missed her and the (unborn) Baby and was not looking forward to when he would go away for his own work trip, and Ms. Bowley replied, "Miss you too! . . . It's ok enjoy it. We will be hearing screaming and crying for a long time.").

[325]    *See id.* at MB000751 (Ms. Bowley telling Mr. Keen that she "[m]ight meet up with a mom [she] met . . . on peanut"); *see also* Exhibit 45 MB000921 (Ms. Bowley also shared her plans to meet another mom with Elaine).

[326]    Trial Exhibit 43 MB000763 & MB000767. *But see* Transcript Day 2 Vol. 2 65:10-22 (when asked whether the parties were still in a dating relationship as of that time, Ms. Bowley replied, "It was very back and forth. I constantly had hope for our relationship because he's the father of my child. So it was very back and forth," and stated that she felt that way since October 2022).

[327]    Transcript Day 1 Vol. 1 58:25-59:12.

[328]    *Id.*

[329]    *Id.* at 59:12-15.

[330]    *Id.* at 59:16-19.

[331]    Trial Exhibit 43 MB000754-55.

[332]    Transcript Day 2 Vol. 2 63:4-23.

Ms. Bowley became upset when Mr. Keen left the appointment early because she "needed things for [her] hospital bag" and that she felt that Mr. Keen "[started] rushing [her] 20 minutes before [the appointment] was supposed to be over."[333]  Before Mr. Keen left for his work trip, the parties engaged in a "blazing row in the flat,"[334] during which Ms. Bowley threw an iPad at Mr. Keen, which struck his elbow,[335] and Mr. Keen allegedly told Ms. Bowley, "You should be grateful you have a roof over your head."[336]  After he left for his trip, Mr. Keen sent Ms. Bowley the following message:

> Caesarean—£25,500
>
> Mum Hotel Stay [for Maecel to stay in London after the birth]—£4,750
>
> [Ms. Bowley's] Work New York Weekend—£700
>
> Baby Stuff John Lewis—£3,000?
>
> Let's not even begin to just go with the basics of paying the rent and food and all bills every month.
>
> New car—£8,000 deposit due June 15th
>
> You need to have a think about things because you must think I am a complete mug.  The way you have zero respect for me providing all the time so you have an amazing life is a piss take and then under my roof you want to talk about another man and how good he is when I have done all the above in just the last month alone?!  Kicking off because I wanted to finish an appointment 10 mins early?!  When we were finished anyway and when you could literally

---

[333]   Trial Exhibit 43 MB000754.

[334]   Trial Exhibit 21 DK0153; Trial Exhibit 63 79.

[335]   Trial Exhibit 63 80 (therapy notes noting the "blazing row" involved an "iPad"); Trial Exhibit 43 MB000764 (Ms. Bowley acknowledged that she "threw the iPad across the room," and when Mr. Keen stated "It smashed off my elbow!," Ms. Bowley replied: "live with it"); Trial Exhibit 45 MB000921 (on May 5, 2023, Ms. Bowley and Mrs. Keen exchanged messages about the incident in which Ms. Bowley threw an iPad at Mr. Keen; Ms. Bowley acknowledged the incident, stating she was sure Mr. Keen had not told Mrs. Keen "why [she] was so irate" as to throw an iPad).

[336]   Transcript Day 1 Vol. 2 75:7-76:24; *see also* Trial Exhibit 63 81 (Dr. Ruspoli acknowledged that Ms. Bowley told her, in session, that during their fight, Mr. Keen told Ms. Bowley "You should be grateful you have a roof over your head.").

go back for 10 mins at any point in the next week whilst I am away?!
Genuinely go and find another mug that does what I do[].[337]

Ms. Bowley replied: "The only thing you have to offer me is financial . . . If [I] knew this
was the case I would've stayed dating the guy with the private jet."[338] She continued:

> You don't give a f[**]k [a]bout anything but you. I could've also stayed in
> L.A. and had the baby. You're showing your true colors again. This was the
> last straw for me. You're a disgrace telling me to fend for myself [a]nd asking
> for money back. Disgusting. You think because you pay for things you can
> treat me like s[**]t? I don't want my son to be around it. Not a good
> environment. We both deserve better. Paying rent and bills? I'm sorry if [I]
> knew you wanted me to split bills with you [I] would've just stayed in LA.
> And you're paying for all this stuff for your son not me. This isn't a shopping
> spree at [C]hanel, this is the birth of your son. How embarrassing that you're
> saying these things. Spoke to my mom and she's going to pay for the room.
> I also won't be here when you're back.[339]

Ms. Bowley "treated [her]self" to a massage and a pedicure the next day.[340]

Two days later, while Mr. Keen was traveling for work, Ms. Bowley discovered
him on a dating app and messaged him to confront him.[341] Mr. Keen admitted to
downloading the app because "[he] was so angry" about their fight on May 3, 2023, but
he assured Ms. Bowley that he did not message anyone or cheat on her, and he
apologized.[342] Ms. Bowley nevertheless believed that Mr. Keen was cheating on her.[343]

---

[337]    Trial Exhibit 43 MB000754 (punctuation added for clarity); *see also* Transcript Day 1
Vol. 2 73:14-75:17 (Dr. Ruspoli interpreted such statements as Mr. Keen not feeling that
Ms. Bowley was grateful for the things he was doing; she noted that "asking for gratitude for
what you do is not controlling," but that Ms. Bowley reported in sessions that "he was at times
aggressive" because he was hurt).

[338]    *Id.* at MB000755.

[339]    *Id.* at MB000755 (punctuation added for clarity).

[340]    *See id.* at MB000755; *see also* Transcript Day 2 Vol. 2 64:10-16 (Ms. Bowley
acknowledged that she did and had the means to do so).

[341]    *See id.* at MB000756; *see also* Transcript Day 2 Vol. 2 65:5-7 (Ms. Bowley testified that
Mr. Keen "lied to [her] about going on a work trip, and he was actually meeting up with women
on a dating app").

[342]    *See id.* at MB000756-59.

[343]    *See id.* at MB000756; *see also* Transcript Day 2 Vol. 1 70:3-20 (Ms. Bowley called
Mr. Keen's sister, Francesca, "crying . . . saying . . . Douglas has cheated. I've got information
to suggest Douglas has cheated.").

Ms. Bowley told him that she would be leaving the next day, stating, "[W]e're obviously over . . . I hope you understand the consequences of your actions . . . Me and my son will be great."[344]   But Ms. Bowley did not leave the next day.

The parties' fight over WhatsApp continued for multiple days while Mr. Keen remained away on his work trip, with Ms. Bowley accusing Mr. Keen of cheating on her and expressing anger that she did not feel represented in his social media presence.[345] Ms. Bowley threatened to go to Los Angeles immediately,[346] and she even messaged Dr. Ruspoli, stating that she'd like to "utilize the [next] session to go over co-parenting."[347]   Again, she did not go to Los Angeles.

On May 6, 2023, Ms. Bowley ultimately told Mr. Keen that he could cancel their planned family vacation to Norfolk[348] and the hotel that he had booked for her mother for after the Baby's birth and that she would be staying with her mother "somewhere else after the [B]aby" was born.[349]   Ms. Bowley stated:  "I am thinking of the baby.  You can obviously come but I'd feel safer with my [mom] taking care of me.  I don't want you getting stressed and then getting mad at me.  I've had the worst pregnancy.  At least let me have a good birth."[350]

Ms. Bowley also said that she wanted to make an appointment to obtain the Baby's U.S. passport "maybe a week after he's born," so "[t]hen when [the passport] comes we'll leave."[351]   In response, Mr. Keen replied:  "If you want to leave on 1st July with the baby and your Mum then that's a different conversation but you're not going a week after the birth."[352]   Ms. Bowley countered:  "Ya [I] said I'm going to the passport place a week

---

[344]     *Id.* at MB000756-58; *see also* Trial Exhibit 45 MB000922 (On May 5, 2023, Ms. Bowley messaged Elaine that Mr. Keen was cheating by "meeting up with other girls," and "[I] hope he understands the consequences of his actions and that means me moving back to LA."); Transcript Day 2 Vol. 1 45:20-46:14 (Elaine testified that she "didn't read [that message] as a directive or an intention" but "as a threat that [Ms. Bowley] wouldn't carry out."); *id.* at 47:19-48:8 (same).

[345]     *See generally* MB000756-58.

[346]     *See id.* at MB000767-68 (Ms. Bowley told Mr. Keen "I think it's best [I] just go to L.A. now.  I'll let you know the details.") (punctuation added for clarity).

[347]     Trial Exhibit 46.

[348]     *See infra* Part IV.H.1 (June 2023:  The Baby's Birth and Family Vacation on the Coast).

[349]     Trial Exhibit 43 MB000765.

[350]     *Id.* at MB000766 (punctuation added for clarity).

[351]     *Id.* at MB000765.

[352]     *Id.* at MB000766.

after [the birth], [a]nd when [the Baby's passport] comes 3 weeks later I'm leaving."[353] Mr. Keen responded with, among other things, a link to a U.K. government website with instructions for obtaining a child's first U.K. passport.[354]

Ms. Bowley left the London flat on May 12, 2023, the day that Mr. Keen returned from his work trip; she stayed at a friend's property in Milton Keynes for about a week.[355] Before Ms. Bowley left, she ordered additional baby items for the London flat,[356] and she organized previously delivered items, including storing the Baby's clothes in drawers.[357]

By the week before the Baby's scheduled birth, the parties had apparently resolved their larger dispute.  They continued to bicker, but they appeared to be in a relationship again:  they resumed "following" each other on social media, and Ms. Bowley wanted "to cuddle [Mr. Keen] and [for the parties] to talk together in bed."[358]  The parties reengaged in the same back-and-forth pattern on May 28, 2023:  they fought; Ms. Bowley said that she "want[ed] to leave" and blocked Mr. Keen; but two hours later, they were messaging each other about getting juice and watching television.[359]

## H.    The Baby's Two Months in London

### 1.    June 2023:  The Baby's Birth and Family Vacation on the Coast

The Baby was born via elective c-section on Friday, June 2, 2023, in the Lindo Wing of St. Mary's Hospital in Central London—the private ward where Prince William and Princess Catherine's children were born.[360]  Mr. Keen was present at the birth, and

---

[353]    *Id.* (punctuation added for clarity).

[354]    *Id.*

[355]    *See id.* at MB000776-77 (Ms. Bowley left on May 12); *id.* at MB000785-86 (Ms. Bowley returned on May 19); Transcript Day 1 Vol. 1 50:14-24 (Mr. Keen acknowledged that Ms. Bowley spent about a week in Milton Keynes); Transcript Day 1 Vol. 2 77:8-78:12 (Dr. Ruspoli acknowledged that in session on May 16, 2023, Marissa had moved out and was living in Milton Keynes and said she would "go back" and "live with mum"); *see also* Trial Exhibit 63 87 & 89 (session notes).

[356]    Trial Exhibit 43 MB000771.

[357]    *See id.* at MB000775 (Ms. Bowley told Mr. Keen that she was organizing and setting up the baby things that were delivered to the London flat); *id.* at MB000800 (Ms. Bowley asking Mr. Keen to bring some onesies and a hat for the Baby to the hospital and directing him to the drawers where he would find them).

[358]    *See id.* at MB000794; *see also id.* at MB000783 (the parties discussed following each other again).

[359]    *See id.* at MB000795-96.

[360]    Transcript Day 1 Vol. 1 54:6-21.

he is named as the father on the Baby's birth certificate.[361]  Mr. Keen paid for Ms. Bowley's obstetric care and delivery by a member of the same team that delivered the royal children.[362]

Elaine visited the hospital the day after the Baby was born.[363]  Maecel arrived in London from California that same day.  Mr. Keen had booked Maecel a hotel across the street from the London flat for approximately six weeks so that she could assist the parties in caring for the Baby.[364]

Ms. Bowley testified that her mother arrived the day after the birth because "[t]he representative at the airline confused the dates because it was in an English format, so she didn't understand that . . . her visa was not expired."  Ms. Bowley stated that she pointed out the confusion and that her mother was able to board a different flight.[365]  But nothing in the parties' message history indicates that Ms. Bowley's mother experienced any difficulties with her flight to London.[366]  Rather, it appears that the c-section was scheduled for June 5, 2023, but Ms. Bowley went into labor and gave birth early, on June 2.[367]  Ms. Bowley's mother would have arrived two days before the scheduled c-section; she arrived a day after the birth because the Baby arrived earlier than planned.

Ms. Bowley, Mr. Keen, the Baby, and Maecel left the hospital together the following Sunday evening.[368]  Ms. Bowley, Mr. Keen, and the Baby returned to Mr. Keen's London flat.[369]  Elaine, who visited the flat numerous times in the weeks after

---

[361]   *Id.* at 14:23-15:5; Trial Exhibit 4 DK0023.

[362]   Transcript Day 1 Vol. 1 55:2-18.

[363]   Transcript Day 2 Vol. 1 34:1-4; *see also id.* at 48:11-49:15 (On cross-examination, Ms. Bowley's counsel asked Mrs. Keen about an alleged conversation she had with Ms. Bowley when they were alone in the hospital after the birth, which Mrs. Keen credibly rejected as "a complete and utter lie.").

[364]   Transcript Day 2 Vol. 1 84:16-25.

[365]   *See* Transcript Day 3 Vol. 1 58:7-25.

[366]   *See generally* Trial Exhibit 43.

[367]   *See id.* at MB000717 ("book Monday 5th June" included in a baby to-do list), MB000756 (Ms. Bowley telling Mr. Keen she can have Tom, her obstetrician, give her a cervical smear test "while he's down there" since "[e]veryone's hands are gonna in and on me on the 5th"), MB000768 ("[The Baby is] coming June 5th"), MB000799 (Ms. Bowley messaged Mr. Keen from the hospital on June 2, "I'm in labor [s]o come," "They said you have an hour," "They're getting me ready"), & MB000800 (Mr. Keen writing as Baby announcing his arrival, "I couldn't hang on until Monday").

[368]   Transcript Day 1 Vol. 1 57:10-13.

[369]   *See id.* at 57:14-16.

the Baby was born,[370] recalled that there were nursery items set up for the Baby including "teddy bears everywhere," "a crib," "a stroller," "a Björn bouncer, changing mat, clothes, baskets, all the general things you have for a baby."[371]

In the time immediately after the Baby was born, Ms. Bowley messaged Mr. Keen that she loved him, and Mr. Keen reciprocated.[372]  The parties appeared to maintain normal, loving relations for about one week until Ms. Bowley apparently became angry at Mr. Keen for not putting away the Baby's clean clothes.[373]  Ms. Bowley ultimately blocked, then unblocked, Mr. Keen on WhatsApp and decided that she and the Baby would stay with Maecel in Maecel's hotel, apparently against Mr. Keen's wishes.[374]  Ms. Bowley told Mr. Keen, "I'm gonna stay here [at the hotel] until we [Ms. Bowley, Maecel, and the Baby] leave back to LA."[375]  In response, Mr. Keen specifically told Ms. Bowley:  "I don't want that."[376]  Mr. Keen testified that, during the five weeks that Maecel spent in London, Ms. Bowley "threatened several times that she was going to remove [the Baby]," including in front of Maecel.[377]

Approximately one week later, the parties traveled with the Baby and Maecel to Francesca's home on the coast for about a week to "get some lovely sea air, . . . take some nice walks together, and just have some nice time together really bonding with the baby."[378]  Ms. Bowley testified that she "didn't want to be rude and decline it, so [she] just agreed to go."[379]  The Court does not credit Ms. Bowley's testimony.

### 2.      July 2023:  Transient Fights with Threats to Remove the Baby and Plans for Family Travel

In the first week of July 2023, approximately one month after the Baby was born, the parties' relationship again appeared to deteriorate.  The parties had a screaming fight

---

370     Transcript Day 2 Vol. 1 34:5-21.

371     *Id.* at 34:22-35:5.

372     Trial Exhibit 43 MB000802-05.  *But cf.* Transcript Day 2 Vol. 2 70:7-22 (when asked about her messages on June 4, 2023, telling Mr. Keen "You're such a good dad [heart-eyes emoji]," and "Love you," Ms. Bowley stated that she couldn't remember if she meant what she said).

373     *See id.* at MB000808-09.

374     *See id.* at MB000809-12.

375     *Id.* at MB000812.

376     *Id.*

377     Transcript Day 1 Vol. 1 58:3-6 & 58:19-24.

378     Transcript Day 2 Vol. 1 70:24-71:12.

379     Transcript Day 3 Vol. 1 69:22-70:19.

in person,[380] and Mr. Keen followed up via WhatsApp: "[The Baby] should be the priority Marissa. Not you or I but [the Baby]. Always. . . . You leaving the house at nearly 11pm and not telling me where you're going isn't acceptable."[381] Ms. Bowley replied: "You haven't ever made him a priority. . . . I've made him a priority by coming and living in hell here with you. Let's not start with unacceptable behavior."[382] Ms. Bowley then blocked Mr. Keen on WhatsApp for approximately one minute.[383]

The parties continued their argument, and Mr. Keen clearly communicated that he did not support or agree with Ms. Bowley moving with the Baby to Los Angeles, stating: "You've got no plan at all. You're going back to L.A.? But can't say where you're going to live. How you're going to be able to support him? Who's going to be your support system realistically there? . . . I don't want my son to be growing up the other side of the world."[384] Ms. Bowley told Mr. Keen that he was "deteriorating [her] mental health" and that the "solution [wa]s to leave [him]," to which Mr. Keen responded: "You can want to leave me but the solution isn't you taking [the Baby to] the other side of the world."[385] Shortly thereafter, Ms. Bowley blocked Mr. Keen again.[386]

In keeping with their pattern, later that day, and for the following weeks, the parties' communicated as committed partners. For example, after Maecel left London, the parties noted that they enjoyed their first weekend alone as a family of three.[387] And in late July 2023, the parties made plans to travel internationally together with the Baby, as a family, in late September.[388]

---

[380]   Trial Exhibit 43 MB000830 (Mr. Keen messaged Ms. Bowley: "The baby is 6 inches from your face and you're not putting him first. You're not putting him first when you're screaming with his ear next to your mouth.").

[381]   *See id.* at MB000829 (punctuation added for clarity).

[382]   *Id.* (punctuation added for clarity).

[383]   *Id.*

[384]   *Id.* at MB000830.

[385]   *Id.*

[386]   *Id.*

[387]   *See id.* at MB000840 (Mr. Keen: "I've enjoyed this weekend;" Ms. Bowley: "Me too. It's nice to be alone just us 3 after having company since he was born;" Mr. Keen: "Yesssss.") (punctuation added for clarity).

[388]   *See id.* at MB000853-54 (Mr. Keen asked Ms. Bowley if it was okay for him to book flights for the three of them to travel as a family to Angsana Corfu between September 22 and 27, 2023; Ms. Bowley replied: "Yes, [i]t looks really pretty, [the Baby] and I will go off on adventures") (punctuation added for clarity). *But see* Transcript Day 3 Vol. 2 31:13-32:8 (when questioned about her reply, Ms. Bowley testified that she was "being agreeable" but did not plan to go on the trip).

The most significant dispute between the parties in this case is whether—despite the Form of Undertaking that Ms. Bowley executed and Ms. Bowley's travel on a round-trip ticket—Mr. Keen knew that Ms. Bowley was leaving for California permanently on August 7, 2023, and whether gave her his permission to do so. The evidence supports Mr. Keen's account: he did not.

According to Mr. Keen, in late July 2023, the parties discussed that Ms. Bowley would travel with the Baby to Los Angeles for two weeks, at which point Mr. Keen would join Ms. Bowley and the Baby; the family would spend another two weeks in Los Angeles together; and all three would return to London at the beginning of September.[389] Mr. Keen stated that the purpose of the trip was "for [the Baby] to meet Marissa's family and friends and then for [the Baby, Mr. Keen, and Ms. Bowley] to spend time together in California as a family for a couple of weeks before [they] returned" to London.[390]

Ms. Bowley maintained that the parties had agreed that Ms. Bowley would take the Baby to Los Angeles and not return and that Mr. Keen had purchased her a round-trip ticket only because it was cheaper than a one-way ticket.[391] Specifically, Ms. Bowley explained that on "July 11[, 2023,] after the [visit to the] U.S. Embassy where [the parties] got the baby's passport and birth registration for the U.S.," while the parties were in the flat with Elaine, Ms. Bowley told Mr. Keen that she was looking at one-way tickets for herself and the Baby to travel to Los Angeles, but the tickets were very expensive.[392] Ms. Bowley stated that Mr. Keen told her to book a round-trip if it was cheaper and that he would pay for it.[393] Ms. Bowley testified that Mr. Keen did buy her a round-trip flight and messaged her, "here, these are the dates. Go on these dates as I said, and this is when you're coming back."[394] She testified that she "was confused" but agreeable because she did not want to argue.[395] Ms. Bowley later testified that she and Mr. Keen spoke about using the return flight for a visit for Ms. Bowley and the Baby "to go back to London," that Mr. Keen "said that he would be able to push that date back

---

[389]   Transcript Day 1 Vol. 1 60:12-17.

[390]   *Id.* at 60:18-21.

[391]   *Cf.* Transcript Day 1 Vol. 2 11:10-12:24 (Mr. Keen refuting that contention on cross-examination).

[392]   Transcript Day 3 Vol. 1 66:14-24.

[393]   *Id.* at 67:1-6.

[394]   *Id.* at 67:7-21.

[395]   *Id.* at 67:21-23; *see also* Transcript Day 3 Vol. 2 6:1-7:4.

easily," and that "he was just booking it for that day and [they could] change it . . . at a later date for a visit."[396]

Again, the evidence undermines Ms. Bowley's testimony. Ms. Bowley did have an interaction with Elaine on July 11, 2023, but the Court does not accept Ms. Bowley's description of the exchange. Elaine left Ms. Bowley a voice message that day expressing her frustration at "be[ing] made to feel alien" by Ms. Bowley in the parties' flat and feeling that Ms. Bowley was keeping the Baby from her.[397] Elaine also told Ms. Bowley, "now I hear that the baby's going abroad with Mum," and she requested "quality time" with the Baby.[398] Elaine testified that she understood that Ms. Bowley was going to the U.S. for a month, not permanently.[399] She explained that "[Ms. Bowley] told [her] that she was going [to California in August] for a month, not only for work but . . . for [Ms. Bowley's] wider family . . . to meet [the Baby,] and that Douglas would be joining two weeks into that holiday."[400] And, indeed, in her reply message, Ms. Bowley told Elaine that the purpose of her trip to Los Angeles was for work and for the Baby to meet her family.[401]

To the extent that Ms. Bowley did, at some point, articulate that she intended to move back to Los Angeles—as she repeatedly threatened—the evidence indicates that she would have done so only pursuant to a legal custody agreement with Mr. Keen. On July 12, 2023, in the early morning hours,[402] Ms. Bowley messaged Elaine, in relevant part: "I also hope we can get an agreement in place and I have been waiting for Dougie to be ready to talk about it. I am more than open to working with him and making things work for the 3 of us and we will make it work."[403] Elaine replied:

> Your Mum told me about the agreement and we both feel it is the best idea. I believe Douglas has asked you what you would like put in the agreement and is waiting for that as a starting point. I am confused by it all because when we

---

[396]   *Id.* at 75:4-18.

[397]   Trial Exhibit 45 MB000929 (messages) & MB000987 (transcript); Transcript Day 2 Vol. 1 54:6-55:21.

[398]   Trial Exhibit 45 MB000929 (messages) & MB000987 (transcript).

[399]   Transcript Day 2 Vol. 1 55:5-9.

[400]   *Id.* at 39:10-19.

[401]   Trial Exhibit 45 MB000929 (Ms. Bowley stated: "As for LA, I'm not only going for work. The only person from my family that has met [the Baby] is my mom so the rest of my family needs to meet him, especially my dad who is ill.").

[402]   Ms. Bowley's message is timestamped "7/11/23, 4:39:27 PM" in Pacific Daylight Time; the time in London was eight hours later.

[403]   *Id.* at MB000929-30.

met you said you wanted to move to London as L.A. was too dirty and dangerous. Now you want to return and take [the Baby]. When we were at Nicholas' you made it sound as if you were going on holiday not moving back as I later found out. . . . This should be a joyous happy time and yet it has become upsetting for all so it needs sorting and a formal agreement put in place. Hopefully [the Baby's] welfare will be the upper thought for you both when the plan is made.[404]

Ms. Bowley agreed.[405]

The evidence shows that Ms. Bowley and Mr. Keen ultimately settled on their original plan, to go to California on holiday as a family. The parties' apparent discussion about purchasing the tickets—including a reference to the trip being the "first" and a decision about which day Ms. Bowley would leave Los Angeles—indicates a clear shared understanding, as of July 17, 2023, that Ms. Bowley and the Baby would return to London:

Mr. Keen: "I sent you premium economy so you were more comfortable . . . Won't be able to pay for it every time but thought first one would be better to do that."

Ms. Bowley: "Ok I'll leave the 5th [of September] instead."

Mr. Keen: "Yeah but that doesn't include taxes for [the Baby] . . . So this is cheapest options . . . Which are another 270 [pounds]."

Ms. Bowley: "September 4th is Labor Day so I'm wondering if it would be busier or if it's better to leave on that day."

Mr. Keen: "Leave on the times I've given . . . As that's the cheapest by considerable amount."

Ms. Bowley: "Ok."[406]

---

[404]   *Id.* at MB000930.

[405]   *Id.* (Ms. Bowley responded, "Yes I completely agree.").

[406]   Trial Exhibit 43 MB000841; *see also id.* at MB000842 (Mr. Keen appears to have purchased the flights: "Costing me 1700 pounds to pay for flights that I don't want you to go on"); *see also* Transcript Day 1 Vol. 2 11:10-12:24 (Mr. Keen's testimony on cross-examination was that the parties disputed "what the best dates were to return," which the messages appear to support).

And a few days later, Ms. Bowley continued to discuss plans for Mr. Keen to join her and the Baby in Los Angeles—and the three of them to stay together—pursuant to the plan to which Mr. Keen testified and Ms. Bowley denied.[407] Based upon the parties' extensive discussions, Mr. Keen appears to have understood that Ms. Bowley and the Baby would be in Los Angeles without him for only those first two weeks, at which point he would join them there for the remainder of the trip.[408]

According to the August 3, 2023, police report of Mr. Keen's arrest, Mr. Keen expressed his concern "that [Ms. Bowley] intend[ed] to take their child to USA permanently without his permission," and Ms. Bowley "stated that she wish[ed] to take the child to USA but [Mr. Keen was] not allowing her to do so."[409] In the "OIC update" in the same police report, the reporting officer noted:

> After having this report allocated, I have spoken to CAIT officers seeking advice on supporting the victim with accommodation and childcare, and as to how the child visitation for long term can be arranged. They have informed me that it has to go through family court, the process initiated by both parties represented by family lawyers, and all visits to overseas with the child etc. need to be agreed to as well as all conditions. . . . [Ms. Bowley] understood the implications that taking the child without the father's consent would amount to committing the offence of child abduction. She has expressed her concerns that she has an upcoming trip to the US between [August 7-September 4, 2023], and that suspect might cancel her flight and might not allow her to leave, although she agreed to return.[410]

At that point, even the London police appear to have understood that Ms. Bowley would be returning to the U.K. from Los Angeles after one month,[411] which supports Mr. Keen's testimony. Indeed, the police report does not note that Ms. Bowley would be staying in the U.S. until an update dated September 3, 2023: "[Ms. Bowley] decided to

---

[407]   *See id.* at MB000844-45 (Ms. Bowley asked Mr. Keen: "Where are we staying in weho when you come to L.A.?" Mr. Keen responded, "Where would you like to stay?" Ms. Bowley replied "Petit ermitage. You would love it.") (punctuation added for clarity).

[408]   *See, e.g.*, *id.* (Mr. Keen messaged Ms. Bowley: "Two weeks is going to be incredibly difficult when you go to LA," to which Ms. Bowley replied: "I'm sure :/").

[409]   Trial Exhibit 51 MB000868.

[410]   *Id.* at MB000871.

[411]   *Id.* at MB000872.

stay in the U.S. with the knowledge of [Mr. Keen], having informed him through his solicitors."[412]

Ms. Bowley's counsel questioned Mr. Keen about obtaining a U.S. passport for the Baby, suggesting that the passport was obtained on an emergency basis because it was for a U.S. citizen in distress and that Mr. Keen knew that Ms. Bowley was traveling to the U.S. with the Baby on a permanent basis.[413]  Again, Mr. Keen denied that contention, instead stating that he accompanied Ms. Bowley to obtain the Baby's U.S. passport "[u]nder severe, severe pressure"; that the passport was automatically deemed an "emergency" passport because the parties sought it on an expedited basis, not due to any distress; and that Ms. Bowley wanted the U.S. passport because she wanted to leave on the same flight as her mother and the Baby's U.K. passport would not be ready in time.[414] The evidence supports Mr. Keen's account.[415]

Ms. Bowley also testified that she ordered baby items to be delivered to her mother's house in Los Angeles.[416]  Ms. Bowley introduced into evidence the receipts for those items, which included a bedside bassinet, an infant bathtub, diapers, wipes, a bouncer, and a nursing pillow.[417]  The bedside bassinet cost $150.[418]  In contrast—also according to a receipt that Ms. Bowley offered into evidence—the bassinet that the parties rented for six months for the London flat cost £95 *per month*.[419]  There was no testimony with respect to whether Mr. Keen knew about or approved of the purchase of baby items for California, and the Court concludes that even if Mr. Keen himself

---

[412]    *Id.* at MB000873.

[413]    Transcript Day 1 Vol. 2 104:5-107:12.

[414]    *See id.*

[415]    Trial Exhibit 43 MB000766 (In early May 2023, Mr. Keen sending the link to "https://www.gov.uk/get-a-child-passport/first-child-passport" and stating "It's straightforward enough and we can apply after we have registered the baby's [U.K.] birth certificate"]; *id.* at MB000811-12 (On June 11, 2023, Ms. Bowley asking Mr. Keen to make an appointment for the Baby's passport at the British embassy and saying "I'd like to get his passports soon please"); *id.* at MB000830 (On July 4, 2023, Ms. Bowley telling Mr. Keen she booked an appointment at the U.S. embassy to report the Baby's birth and get his U.S. passport, and both parties would need to attend); Trial Exhibit 6 (Baby's U.K. passport, issued August 11, 2023, and U.S. passport, issued July 11, 2023).

[416]    Transcript Day 3 Vol. 1 67:24-68:23.

[417]    Trial Exhibit 50.

[418]    *Id.*

[419]    Trial Exhibit 49; *see also* Trial Exhibit 43 MB000809 (the parties discussing the monthly cost of the Snoo bassinet); *supra* Part IV.G (Spring 2023:  House Hunting and Preparing for Baby in London; a Second Temporary Separation) (the May 2023 John Lewis shopping trip cost somewhere between £3,000 and £5,000).

purchased those items, their significantly lower cost—compared to the many expensive baby items at the London flat—supports the inference that those items would be used for a month-long visit rather than permanently.

### 3.    August 2, 2023:  Final Altercation and Mr. Keen's Arrest

The Baby had his first routine vaccinations mid-day on Wednesday, August 2, 2023, in London.[420]  Both parties attended the Baby's appointment, after which the family returned to the flat.[421]  After Mr. Keen left to attend a meeting, Ms. Bowley communicated to Mr. Keen that the Baby had spiked a fever and was fussy.[422]  Mr. Keen noted that, when he returned home, the Baby was still not doing well:  "He had . . . a ridiculously high temperature and was very agitated."[423]  Ms. Bowley had made plans to go to dinner with friends.  Despite the Baby's condition, Mr. Keen encouraged Ms. Bowley to go because it was the only night that her friends were available and he "wanted her to have a good time again."[424]

Ms. Bowley's dinner was scheduled for 9:00 p.m.[425]  Mr. Keen testified that Ms. Bowley left for dinner, which was about ten minutes away, late—at around 9:20 p.m.[426]  Ms. Bowley messaged Mr. Keen at around 9:45 p.m. to let him know that her party had been seated, and again around 10:20 p.m. asking if the Baby was okay.[427]  Mr. Keen testified that he did not respond to Ms. Bowley's first message because the Baby was "screaming and going crazy, . . . hadn't slept, . . . [and] wasn't taking the bottle."[428]  He stated that the Baby had a "ridiculously high" and "blazing" temperature.[429]  Mr. Keen replied to Ms. Bowley's second message saying as much.[430]  Mr. Keen continued:  "I think you need to remember he's 8 weeks old [a]nd you only breastfeed him.  It's 10:30pm [a]nd he had vaccines today.  [Tonight was v]ery

---

[420]    Transcript Day 1 Vol. 1 65:16-22.

[421]    *See id.* at 65:22-23.

[422]    *See id.* at 65:5-66:5.

[423]    *See id.* at 66:1-18.

[424]    *See id.* at 66:20-67:3.

[425]    Trial Exhibit 43 MB000860.

[426]    Transcript Day 1 Vol. 1 67:5-7.

[427]    Trial Exhibit 43 MB000860; *see also* Transcript Day 1 Vol. 1 67:9-15.

[428]    *Id.*

[429]    Transcript Day 1 Vol. 2 114:10-16 (acknowledging upon cross-examination).

[430]    Trial Exhibit 43 MB000860; *see also* Transcript Day 1 Vol. 1 67:15-17.

ambitious."[431]  Per Mr. Keen's testimony, Ms. Bowley did not take that well:[432]  she called him "horribke [*sic*]," accused him of "shaming" her, and told him that the Baby "obviously [wa]sn't comfortable with [him]."[433]  At 10:35 p.m., Ms. Bowley messaged Mr. Keen that she was "on [her] way home" to the flat.[434]

Ms. Piza was at the dinner with Ms. Bowley.  Ms. Piza testified that via text Mr. Keen called Ms. Bowley the "c" word, he "was calling her names," and he was "demanding that she would go home immediately."[435]  The evidence simply does not support any of that testimony.  In the parties' WhatsApp messages, Mr. Keen did not call Ms. Bowley any names, including the "c" word, and he did not demand, nor even request, that she return home.[436]

Ms. Bowley testified that the Baby was "fine," "just tired," and that the parties gave him Calpol to prevent a fever, but "[h]e did not have a fever."[437]  On cross-examination, Mr. Keen stated that he did not measure the Baby's temperature because "he was bright red" and "baking hot" and that the Baby's doctor who had administered the Baby's vaccines that afternoon told the parties "that it was likely that [the Baby] would have a temperature for the next 12 hours."  Mr. Keen noted that the reason that the parties administered Calpol for the first time that afternoon was because the Baby did have a temperature.[438]  Mr. Keen reported that he did not take any additional cautionary steps because "the fact that [the Baby] had this temperature and Marissa felt comfortable enough to go out for the evening suggested that the temperature wasn't going to be causing too much discomfort and that it was what the doctor had said, and it was going to be 12 hours."[439]  Based upon Ms. Bowley's extensive track record of fabrications throughout her testimony, the Court credits Mr. Keen's account.

---

[431]    Trial Exhibit 43 MB000860 (punctuation added for clarity); *see also* Transcript Day 1 Vol. 1 67:18-20.

[432]    Transcript Day 1 Vol. 1 67:20-21.

[433]    Trial Exhibit 43 MB000860.

[434]    *Id.*

[435]    Transcript Day 2 Vol. 2 47:4-12.

[436]    Trial Exhibit 43 MB000860.

[437]    Transcript Day 3 Vol. 1 77:9-11.

[438]    Transcript Day 1 Vol. 2 114:10-115:24.

[439]    *Id.* at 115:25-116:6.

The parties' accounts of what happened between them when Ms. Bowley returned home differ.  Ultimately, Mr. Keen was arrested and incarcerated overnight.[440]

### a.    Mr. Keen's Version

Mr. Keen testified that he was sitting with the Baby when Ms. Bowley "came storming into the apartment" and immediately said "'Give him to me' and snatched [the Baby]" out of Mr. Keen's arms.[441]  Mr. Keen alleged that Ms. Bowley seemed like "she definitely had a couple of drinks."[442]  He stated that he "walked around eight . . . to ten feet," collecting discarded diapers and putting them in the garbage, while Ms. Bowley told him "you just don't know how to look after [the Baby].  You are useless with him.  You just don't know what you are doing with him."[443]  Mr. Keen turned to Ms. Bowley and told her, "that is enough. . . .  You cannot keep telling me day in and day out that I am useless and that I don't know what I am doing.  It's completely unacceptable."[444]  Mr. Keen attested that Ms. Bowley was trying to take a video of him on her phone—which she had done multiple times in recent weeks—which contributed to his suspicion "that she was up to something and planning something."[445]  Mr. Keen recounted that he "went to try and get the phone off [her]," but Ms. Bowley put the phone behind her back.[446]  He then walked into the bedroom, closed the door behind him, and put clothes away when he heard the front door slam; he walked out of the bedroom and saw Ms. Bowley proceeding up the stairs on her phone to the police.[447]  According to the parties' messages, 11 minutes after Ms. Bowley said "I'm on my way home," Mr. Keen messaged her, "It is freezing cold.  The baby hasn't got any clothes on."[448]

The Court credits Mr. Keen's testimony.

### b.    Ms. Bowley's Version

Ms. Bowley testified that she walked into the flat, and before she could say anything, Mr. Keen started screaming at her while holding the Baby:  "Don't f'g start

---

[440]    *See supra* Part II (Background).

[441]    Transcript Day 1 Vol. 1 68:8-13.

[442]    *Id.* at 68:15-19.

[443]    *Id.* at 68:21-69:7.

[444]    *Id.* at 69:9-14.

[445]    *Id.* at 69:15-20.

[446]    *Id.* at 69:22-24.

[447]    *Id.* at 69:24-70:10.

[448]    Trial Exhibit 43 MB000860 (punctuation added for clarity).

with me.  I told you not to 'f' with me,"[449] and "I told you what would happen."[450]  She stated that she told Mr. Keen to give her the Baby, which he did, and she tried to record Mr. Keen on her phone.[451]  Ms. Bowley testified that, in early July 2023, Mr. Keen had threatened to make her homeless in London, and she understood him to be repeating that threat.[452]  Ms. Bowley originally testified that she was able to record Mr. Keen "coming at" her before sitting on her phone[453] and that she had the video;[454] she later corrected her testimony to state that she was not able to record the video in that instance and was thinking of a different video that she had recorded.[455]  Ms. Bowley did not submit any videos into evidence.

According to Ms. Bowley, after she sat on her phone, Mr. Keen abruptly went into the bedroom, so she ran out of the apartment with the Baby and called the police.[456]  She testified that she "notified [her] friend Stephanie what happened," and all three of her friends who had been at the dinner "immediately left dinner and came to the apartment."[457]

The Court does not believe Ms. Bowley's testimony.

### 4.   Form of Undertaking and the Baby's Removal

Mr. Keen testified that Ms. Bowley "threatened on several occasions, 'I'm just going to take [the Baby].  I'm going to leave.  I'm going to take [the Baby].'"[458]  Those threats prompted Mr. Keen to contact a family law firm in London.[459]  Mr. Keen had a telephone call with a lawyer from that firm about two weeks before Ms. Bowley departed London with the Baby; Mr. Keen testified that the lawyer told him "no, [Ms. Bowley] is

---

449   Transcript Day 3 Vol. 1 80:22-81:8.

450   *Id.* at 81:22.

451   *Id.* at 81:8-16.

452   *Id.* at 81:25-82:22.

453   *Id.* at 83:7-23.

454   *Id.* at 128:1-19.

455   Transcript Day 3 Vol. 2 84:13-85:18.

456   Transcript Day 3 Vol. 1 83:24-84:11.

457   *Id.* at 87:6-11.  *But see* Transcript Day 2 Vol. 2 47:14-23 (Ms. Piza testified that she left dinner after Ms. Bowley and went to the London flat because she "could tell that something was very urgently wrong"—not because Ms. Bowley notified her of the arrest).

458   Transcript Day 1 Vol. 1 59:23-25.

459   *Id.* at 60:3-7.

not legally able to remove [the Baby]."[460]  Mr. Keen also testified that he felt that Ms. Bowley "was acting differently, . . . and she [wa]s planning something," so he emailed the same lawyer on July 31, 2023:  "Marissa is due to be heading to L.A. next Monday.  I'm very nervous and very anxious that she is not going to return.  Please can we arrange a meeting?"[461]  The lawyer agreed to meet Mr. Keen on Thursday, August 3, 2023.[462]

Mr. Keen was released from police custody after 16 hours, during which time he missed his appointment with the family lawyer.[463]  Francesca was able to stay with Mr. Keen in jail for a few hours because she is an attorney with a background in criminal litigation.[464]  Mr. Keen's mother and sister had communicated with the family lawyers while Mr. Keen was in custody, and they moved the appointment to the following day. The lawyers told Mr. Keen that in the meantime, "they could make up a document that says Marissa is going [to California] purely for holiday and she will be returning on this date."[465]  As discussed above,[466] Mr. Keen's solicitor prepared and presented Ms. Bowley with a "Form of Undertaking," which Ms. Bowley signed, indicating that she agreed that London is the Baby's home, that she would return with the Baby from Los Angeles to London by August 23, 2023, and that she acknowledged the legal ramifications of failing to do so.

Francesca testified that she also contacted Family Law in Partnership and asked that firm to seek an emergency injunction at the High Court to prevent Ms. Bowley from permanently removing the Baby from the U.K. because "[she, Francesca,] could see where Marissa's behavior was going."[467]  That request for an injunction was never

---

[460]   *See id.* at 60:22-61:4.

[461]   *Id.* at 61:5-14; *see also* Trial Exhibit 51 MB000872 (While in custody, Mr. Keen told the police that Ms. Bowley's call to the police and report of the alleged October incident "was motivated by the fact that [Ms. Bowley] want[ed] to take the child back to the [United States] and he d[id] not agree with th[at], as he fear[ed] she might not return.").

[462]   Transcript Day 1 Vol. 1 62:4-5.

[463]   *Id.* at 74:9-12.

[464]   Transcript Day 2 Vol. 1 69:1-13.

[465]   Transcript Day 1 Vol. 1 74:12-17.

[466]   *See supra* Part II (Background).

[467]   Transcript Day 2 Vol. 1 71:13-72:4.

filed.[468]  Ms. Bowley's counsel acknowledged that, had Mr. Keen sought that injunction, there is "[n]o question" that the High Court would have granted it.[469]

Ms. Bowley admitted to signing the Form of Undertaking, and she acknowledged that it was "a true fact" that the Baby had resided in the London flat continuously since he was born.[470]  Ms. Bowley stated that she signed that document "under extreme pressure and stress" and that she "had about an hour and a half to sign" it, "had no lawyer, no solicitor, no advice," and "nobody with [her]."[471]  She testified that Mr. Keen's solicitor sent her an email with the Form of Undertaking at around 2:30 p.m. on August 3, 2023, the solicitor texted Ms. Bowley about 10 to 20 minutes later telling her to check her email, and the solicitor called Ms. Bowley 15 minutes after that.[472] Ms. Bowley explained that she "was extremely desperate to leave [and] confused about why [she] was even getting [the Form of Undertaking]," in view of her plans to remove the Baby to California permanently with Mr. Keen's permission.[473]  Ms. Bowley interpreted the notices included in the Form of Undertaking—regarding her legal liability pursuant to British law if she were to violate the agreement—as "[m]ore threats."[474]  But she also stated, "I don't understand anything from this letter.  And that's why I spoke to his attorney multiple times and explained to her that I didn't understand this letter."[475] Ms. Bowley specifically asked Mr. Keen's solicitor to change the Form of Undertaking language to exclude that the Baby is "habitually resident" in London; the solicitor complied and changed that language to state that the Baby was born in London and "has always resided in London" since his birth.[476]  Ms. Bowley testified that she signed the amended document the next day because she understood that if she did not, then Mr. Keen would cancel her flight to the U.S., the parties would be "going to court the next day," and she "would be paying for [Mr. Keen's] court fees."[477]  Although the solicitor's email included multiple forms of contact information for a different family law

---

[468]     *Id.* at 72:4-73:6.

[469]     Transcript Day 3 Vol. 2 108:7-24.

[470]     Transcript Day 2 Vol. 2 73:21-74:22; *see also* Trial Exhibit 9 (the Form of Undertaking).

[471]     *Id.* at 75:5-8; *see also* Transcript Day 3 Vol. 1 92:16-22.

[472]     Transcript Day 3 Vol. 1 90:11-92:8.

[473]     Transcript Day 2 Vol. 2 75:14-21; *see also* Transcript Day 3 Vol. 1 93:4-21 (Ms. Bowley disagreed that the plan was for the family to visit Los Angeles on vacation)

[474]     Transcript Day 2 Vol. 2 76:5-11.

[475]     *Id.* at 76:12-22.

[476]     Transcript Day 3 Vol. 1 96:23-97:23; *see also* Trial Exhibit 52 MB00043.

[477]     Transcript Day 3 Vol. 1 98:24-99:4.

firm and "urge[d]" Ms. Bowley to obtain legal advice,[478] Ms. Bowley testified that she "did not know how to go about getting legal advice in England."[479]

With respect to the Form of Undertaking, Ms. Bowley testified that she did not break any promises: "There was no promises. I originally planned to go home with my son, and Douglas was aware." She described the Form of Undertaking as "retaliation" by Mr. Keen for his arrest, "because he knew that I was going home. And he tried to coerce me and threaten me and use his controlling behavior and coercive control again . . . ."[480] She admitted that her flight with the Baby to California was a round-trip ticket, but she stated, "That didn't mean I was going to return on that date."[481]

The police report from Mr. Keen's arrest undermines Ms. Bowley's position. With respect to the parties' planned trip to Los Angeles, it states:

> It has been discussed that a long term solution for this situation will be to have a legal agreement between parties via family court. As the upcoming trip is so close, it has been suggested that [Ms. Bowley] possibly would sign a temporary agreement to return in September as planned, then steps could be taken towards a final agreement via court before. . . .

> [Mr. Keen] agreed to leave his address in order for [Ms. Bowley] and their son being comfortable at the address until the travel. They agreed to have the agreement signed that [Ms. Bowley] would be allowed to travel to the U.S. between [August 7-September 4, 2023], and suspect would be able to use his address from the time she travelled to the U.S. exiting the address.[482]

Furthermore, Ms. Bowley's counsel stated, in response to a direct question from the Court, that, in lieu of the Form of Undertaking, Mr. Keen could have obtained an order from a U.K. court preventing Ms. Bowley from leaving the country with the Baby, such that the removal would have been "without a doubt" in violation of English law.[483]

The weekend after the arrest, Mr. Keen and his extended family spent unsupervised time with the Baby in London—three hours on Saturday and four hours on

---

[478]    *See* Trial Exhibit 52 MB00041.

[479]    Transcript Day 3 Vol. 1 99:11-13.

[480]    Transcript Day 2 Vol. 2 77:14-78:1.

[481]    *Id.* at 78:2-5.

[482]    Trial Exhibit 51 MB000871-72 (from three report entries on August 3, 2023, timestamped between 5:14 p.m. and 5:50 p.m.).

[483]    Transcript Day 3 Vol. 2 108:7-24.

Sunday—before Ms. Bowley and the Baby left for California.[484]  Elaine described that event as follows:[485]

> [T]he arrest was a Thursday.  On the Saturday afternoon, all afternoon, and on the Sunday afternoon, all afternoon, Douglas had the baby, and I accompanied him.  And then on the Sunday of that, the whole family got together because it had been a traumatic week for the family.  It's not what we're used to.  So we all got together to support Douglas and the baby, and we had a picnic in the park.

Ms. Bowley testified that she allowed Mr. Keen to take the Baby during those times because he is the Baby's father, and she "knew that the baby would be safe and well-taken care of" with Mr. Keen and his family.[486]

Ms. Bowley left the U.K. with the Baby the next day.  When asked during trial why he did not cancel the trip, Mr. Keen responded:  "I felt like it was important for Marissa to spend time with her family and friends and to have a trip that we had already organized for several weeks" and that he was still trying to work on the relationship "because I wanted the best for [the Baby], and I wanted there to be a healthy dynamic between both our child's parents."[487]

## I.  Additional Facts Pertaining to Habitual Residence

### 1.  The Baby Lived in London Before He Was Removed

The Baby's birth certificate lists Mr. Keen's London address as the Baby's residence.[488]  The Baby lived at that address from the time he was born on June 2, 2023, until Ms. Bowley removed him from the U.K. approximately two months later.[489]

Additionally, in the very short time that he lived in the U.K., the Baby was enmeshed with family and friends in London to the extent that any newborn can be.  He was born into a tight-knit, supportive family—the Keens all live in the area and gather together frequently, which included visiting the Baby multiple times after he was born.[490]

---

484    Transcript Day 1 Vol. 1 77:6-12.

485    Transcript Day 2 Vol. 1 39:23-40:10.

486    Transcript Day 3 Vol. 1 102:13-103:12.

487    Transcript Day 1 Vol. 1 75:7-16.

488    Trial Exhibit 4.

489    Transcript Day 1 Vol. 1 16:16-17:2.

490    *See, e.g.*, *supra* Parts IV.C.2-3 (Keen Family Gatherings & Privé Luxury Travel One-Year Anniversary Celebration), IV.D.1 (October 12, 2022:  Announcing the Pregnancy to the Keen

The Baby also had established pediatric care in London,[491] and he even attended a "reunion" of parents and babies from the parties' antenatal class.[492]

### 2.      The Parties Planned to Raise the Baby in London

Mr. Keen testified that "[t]he plan was always to remain in London."[493]  He and Ms. Bowley discussed that the Baby would live in his Central London flat after he was born, and Mr. Keen never agreed that Ms. Bowley should remove the Baby to Los Angeles.[494]

Additionally, the parties appear to have discussed that the Baby's pediatric care would continue in London beyond August 2023.  On July 27, 2023, the parties had the following conversation about the Baby's upcoming appointment, and whether he should continue under private care or the U.K. National Health Service ("NHS") going forward:

> Ms. Bowley:   "I made an appt for his checkup and vaccines on August 2nd at 12:10."[495]

> Mr. Keen:  "Okay great thank you."

> Ms. Bowley:  "Yiannis is out until the end of august so he'll be seen by a diff doctor initially and then he'll be under Yiannis going forward.  Cromwell hospital—12:10 . . . £270 initial cost £400 vaccines."

> Mr. Keen:   "[wide eyes emoji] [crying-laughing emoji]"

> Ms. Bowley:  "Lolll we can cancel if you want to go through NHS"

---

Family), IV.D.4 (Christmas With Both Families in London), IV.G (Spring 2023:  House Hunting and Preparing for Baby in London; a Second Temporary Separation), IV.H.1 (June 2023:  The Baby's Birth and Family Vacation on the Coast), & IV.H.4 (Form of Undertaking and the Baby's Removal).

[491]      *See infra* Part IV.I.2 (The Parties Planned to Raise the Baby in London).

[492]      Transcript Day 3 Vol. 2 39:9-40:3.  *But see* Transcript Day 3 Vol. 1 68:24-69:11 (Ms. Bowley testified that the Baby never attended any mommy and me type classes or made any friends).

[493]      Transcript Day 1 Vol. 1 37:18.

[494]      *Id.* at 53:16-23.

[495]      That was the vaccine appointment the day of Mr. Keen's arrest.

Mr. Keen:  "No it's okay.  Would rather done this way I think.  But then maybe we will start going down NHS route where possible moving forward.  He's covered on my private health insurance now anyway."[496]

### 3. The Parties Had Already Commenced a Custody Determination Under U.K. Law When Ms. Bowley Removed the Baby

In an update dated August 18, 2023, the police report of Mr. Keen's arrest notes that "[Ms. Bowley wa]s still in the U.S., and informed [the reporting officer] that she now ha[d] a U.K. based solicitor who will represent her in [U.K.] family court matters regarding their child."[497]

Additionally, Ms. Bowley testified that the parties had agreed in February 2023 to a coparenting plan in which she would return with the Baby to California to live.[498]  She stated that Mr. Keen was speaking with an attorney in London to make the coparenting plan official.[499]  Although the Court doubts the veracity of Ms. Bowley's alleged timeline—the evidence indicates that Mr. Keen first contacted a lawyer in July 2023[500]—Ms. Bowley's testimony evinces her understanding, as early as February 2023, that U.K. law would govern the party's custody dispute.[501]

### 4. Ms. Bowley Resided in the London Flat with Mr. Keen

The history of the parties' relationship leads the Court to find that—with the few temporary breaks described above—Ms. Bowley resided in London with Mr. Keen, and both parties planned to continue living together with the Baby as a family in London.  Indeed, although Ms. Bowley was never listed on Mr. Keen's lease for the London flat and never contributed to the rent,[502] on August 3, 2023, Ms. Bowley told the London police that she "reside[d]" there.[503]

---

[496]  Exhibit 43 MB000853.  Note that the Baby did indeed have his vaccines on August 2.  *See supra* Part IV.H.3 (August 2, 2023:  Final Altercation and Mr. Keen's Arrest).

[497]  Trial Exhibit 51 MB000873.

[498]  Transcript Day 3 Vol. 2 34:7-17.

[499]  *Id.* at 34:18-21.

[500]  *See supra* Part IV.H.4 (Form of Undertaking and the Baby's Removal).

[501]  *See also* Trial Exhibit 45 MB000929-30 (Ms. Bowley messaging with Elaine in mid-July 2023 about an "agreement" with respect to the Baby).

[502]  Transcript Day 1 Vol. 2 143:20-144:8.

[503]  Exhibit 51 MB000867.

While Mr. Keen acknowledged that the ICACU application lists Ms. Bowley's "[c]ountry of habitual residence" as "U.S.A.,"[504] he testified credibly that he only vaguely remembered signing it on August 25, 2023, three days after he was told that Ms. Bowley would not be returning to California with the Baby; that Family Law in Partnership completed the form out and submitted it on his behalf; that he subsequently fired that firm because "[he] felt that there [were] lots of occasions where they were very poor"; and that he honestly would not have been able to give an answer for what Ms. Bowley's country of habitual residence was on August 25, 2023, had he been asked that day, because "[his] mind was all over the shop."[505]

### a. Health Insurance

On June 24, 2023, Mr. Keen sent Ms. Bowley a picture of a notice that she had received in the mail at the London flat.[506] That notice was from the NHS, and it stated that Ms. Bowley had been registered with a general practitioner practice in the U.K. in March 2023.[507] On cross-examination, Mr. Keen acknowledged that the NHS notice contains a paragraph at the bottom stating that "[h]aving an NHS Number does not mean you are automatically entitled to the free use of all NHS services,"[508] but he testified that Ms. Bowley did use NHS services for which she was not charged and that he "still receive[s] messages to this day and letters in the post asking her to come in for appointments. . . . [L]etters with Marissa's name on [them] offering free services on the NHS."[509]

Ms. Bowley, in turn, acknowledged that she was registered with NHS, that NHS offered her screening services as of May 5, 2023, and that when she told Mr. Keen that she might need them, Mr. Keen instructed her to "Get an appointment booked in."[510] When asked about a box of Paracetamol pain medication dated June 4, 2023, and labeled "Bowley Imperial College Healthcare NHS Trust," Ms. Bowley testified that Mr. Keen paid for the medication as it was included in the private health care that he purchased for

---

[504]    Trial Exhibit 3, DK0009-10.

[505]    Transcript Day 1 Vol. 2 144:24-151:14 (direct questioning by the Court and cross-examination by Ms. Bowley's counsel).

[506]    Transcript Day 1 Vol. 1 56:2-17; *see also* Trial Exhibit 27 DK0191; Trial Exhibit 43 MB000825.

[507]    Trial Exhibit 27 DK0190.

[508]    *See id.*

[509]    Transcript Day 1 Vol. 2 107:13-110:2.

[510]    Transcript Day 2 Vol. 2 71:14-23; *see also* Trial Exs. 27 & 28.

the Baby's birth.[511]  But Ms. Bowley insisted that she never received free services from the NHS and that she received an NHS number because the NHS Trust is part of the private hospital that the parties used for her prenatal care and birth.[512]

Without Ms. Bowley's medical records, her use of NHS's free services is impossible to verify.  But the fact that Ms. Bowley lacked any U.S. health insurance[513]—particularly as a pregnant and recently post-partum woman—in light of Ms. Bowley's generally unreliable testimony, leads the Court to find that this evidence weighs in Mr. Keen's favor.

### b.   Ms. Bowley Was Able to Work and Earn Money in London

Ms. Bowley worked remotely in London from the beginning of her time there.[514] In fact, Mr. Keen was late to Elaine's birthday lunch at Nobu on August 22, 2022, because she was working.[515]

Ms. Bowley acknowledged that she was able to work and did work on her computer throughout her pregnancy,[516] and there is ample evidence that she did so.  Ms. Bowley appears to have continued working from London late into her pregnancy,[517] and even within the first two months post-birth.[518]  Ms. Bowley was able to have calls with her influencer clients,[519] and, according to her messages, she continued to close deals in London through at least late-July 2023.[520]  In late-April 2023, Ms. Bowley even implied

---

[511]   Transcript Day 2 Vol. 2 72:24-73:20; *see also* Trial Exhibit 29.

[512]   Transcript Day 2 Vol. 2 95:20-96:12 & 98:18-99:2.

[513]   Transcript Day 2 Vol. 1 98:8-13; Transcript Day 2 Vol. 2 132:10-24.

[514]   *See, e.g.*, Trial Exhibit 43 MB000358 (Ms. Bowley stated:  "Trying to decide where [I] want to work from"); *id.* at MB000360 (Ms. Bowley stated:  "I'm gonna try and nap for a bit then work"); *id.* at MB000365 (Ms. Bowley stated:  "I'm gonna attempt to work at white city"); *id.* at MB000370 (Ms. Bowley stated:  "I'm gonna work at 180").

[515]   *See supra* Part IV.C.2 (Keen Family Gatherings).

[516]   Transcript Day 2 Vol. 1 98:16-21; *see also* Transcript Day 2 Vol. 2 64:17-19 (Ms. Bowley acknowledged that she was working from London as of May 2023).

[517]   Trial Exhibit 43 MB000781-82 & MB000791 (Ms. Bowley stated:  "[J]ust working and trying to close this deal . . . Closing at $1,400").

[518]   *See id.* at MB000842 (Mr. Keen asked Ms. Bowley:  "Where's all your money coming from?!," to which Ms. Bowley replied:  "What do you mean? The deals that [I] closed").

[519]   *See id.* at MB000715 (in late March 2023, Ms. Bowley told Mr. Keen that she was "[h]aving a call with new client Cara soon because she feels i don't check in with her enough (every single day all day)"); *see also id.* (Ms. Bowley telling Mr. Keen that she was working).

[520]   *See id.* at MB000842.

that she would be working *in* London, not merely remotely.[521]  Ms. Piza, Ms. Bowley's witness and employer, testified that in the autumn of 2022, Ms. Bowley was earning about $1,000 to $2,000 per month, but by the Spring of 2023, Ms. Bowley was earning about $5,000 to $6,000 per month—all while Ms. Bowley was in London.[522]

The Court does not pass judgment upon whether Ms. Bowley was ***legally*** working in the U.K.  Ms. Bowley testified that she has never had an immigration status that would allow her to work in the U.K. or to live there indefinitely.[523]  She understood that she was allowed to be physically present in the U.K. "[n]o longer than six months" at a time.[524] And Mr. Keen attested that the parties "discussed applying for a work visa [for Ms. Bowley]," but they never followed through.[525]  Mr. Keen consistently testified that he was not familiar with U.K. immigration law and, specifically, what the implications of Ms. Bowley becoming a mother to a U.K. citizen would be upon her own immigration status.[526]

Ms. Bowley's attorney pressed Mr. Keen about Ms. Bowley's immigration status in cross-examination.[527]  Counsel asserted that Mr. Keen knew that Ms. Bowley would have to leave the U.K. six months after she last entered—which was in April 2023 after her trip to New York—and, therefore, Mr. Keen knew that Ms. Bowley would be returning to the U.S. with the Baby because she could not legally live and work in the U.K.[528]  As he did consistently, Mr. Keen denied that assertion, stating that he "thought that once Marissa had the baby, everything would change, and that she would be able to remain in the U.K."[529]

Ms. Piza testified that "it wouldn't be possible" for her to employ Ms. Bowley if Ms. Bowley were not living in Los Angeles.[530]  Ms. Piza further stated that she expected

---

[521]     *See id.* at MB000753-54 (Ms. Bowley told Mr. Keen: "Instead of being happy for me that [I'm] gonna work here you're being negative and saying you've never met him and who is he," and Mr. Keen's response appears to confirm that Ms. Bowley was discussing her work— "[W]hen you talk to me about your work, I know that you're doing it").

[522]     Transcript Day 2 Vol. 2 43:5-20.

[523]     Transcript Day 3 Vol. 1 12:16-13:2.

[524]     *Id.* at 13:17-23.

[525]     Transcript Day 1 Vol. 1 96:2-99:25.

[526]     *Id.*

[527]     Transcript Day 1 Vol. 2 98:2-103:16; *see also id.* at 136:19-139:21 (renewed cross-examination questioning on the same exchange).

[528]     Transcript Day 1 Vol. 2 102:17-19.

[529]     *Id.* at 102:17-19.

[530]     Transcript Day 2 Vol. 2 36:18-37:2.

to see Ms. Bowley in Los Angeles after her Summer 2022 vacation, which she understood to be a few weeks long.[531]   The Court finds those statements unconvincing, particularly in light of Ms. Piza's next statement that she continued to employ Ms. Bowley through the next time they got together in London in October 2022 because "[Ms. Bowley] was doing everything remote,"[532] and in view of the fact that Ms. Piza continued to employ Ms. Bowley throughout her pregnancy, the majority of which Ms. Bowley spent in London, working remotely.

### c.   U.K. Phone

Ms. Bowley also testified that she never had a U.K. phone or mobile number.[533] She recounted that she used her American number mainly over Wi-Fi but paid about $400 of her own money to use data when Wi-Fi was unavailable[534] and that Mr. Keen bought a U.K. phone for a new employee that Ms. Bowley used for only five days.[535]

But the Court does not believe Ms. Bowley; the record undermines her testimony. In December 2022, Mr. Keen told Ms. Bowley that he would "sort it" so she would have a U.K. phone.[536]   And in July 2023, Mr. Keen messaged Ms. Bowley that her new phone would be arriving "on Monday."[537]   A few days later, Ms. Bowley messaged Mr. Keen to ask "which iPhone [he got her so she could] look at cases."[538]   When he responded, "Iphone 14," she sent him what appears to have been a photo of a particular phone case, saying "I like this one please"; Mr. Keen responded "Okay boss."[539]   On Tuesday, August 1, 2023, Mr. Keen asked Ms. Bowley if she wanted anything from the Nike store, and he instructed her to download the Nike app onto her "U.K. phone."[540]   When questioned about that exchange, Ms. Bowley testified that Mr. Keen was referring to his employee's phone that Ms. Bowley was borrowing.[541]   The Court does not credit Ms. Bowley's testimony.

---

[531]   *Id.* at 37:8-16 & 39:2-4.

[532]   *Id.* at 37:17-39:16.

[533]   *See, e.g.*, *id.* at 72:13-14; *id.* at 96:17-22.

[534]   *Id.* at 96:23-97:11.

[535]   *Id.* at 102:9-18.

[536]   Trial Exhibit 43 MB000551.

[537]   *Id.* at MB000846.

[538]   *Id.* at MB000849.

[539]   *Id.*

[540]   *Id.* at MB000859.

[541]   Transcript Day 3 Vol. 2 32:9-23.

J.   **Additional Facts Pertaining to Grave Risk**

1.   **Alleged Physical Violence**

Mr. Keen testified that "90 percent" of Ms. Bowley's Declaration in Support of the DVRO was "complete fantasy."[542]  The Court agrees.  As discussed above,[543] the Court finds that Ms. Bowley lied about Mr. Keen's alleged violence toward her.

Mr. Keen testified that he "never, not once," physically assaulted Ms. Bowley.[544] When the Court asked Mr. Keen directly, he credibly maintained that he never struck Ms. Bowley; he never put his hands on her in anger—only "on her wrist when she was punching and scratching [him]"; and he raised his voice to her in anger very few times over their 12-month relationship.[545]  Over the course of the parties' 13 joint therapy sessions,[546] Ms. Bowley never reported to Dr. Ruspoli that Mr. Keen was violent;[547] rather, Ms. Bowley's chief complaints were that Mr. Keen was not attentive enough to her, that he worked too much, and that he lacked boundaries around other women.[548]

The parties exchanged approximately 13,000 WhatsApp communications between their meeting in August 2022 and Mr. Keen's arrest in August 2023.[549]  As both parties testified, and the Court confirmed, the messages contain no references to any physical

---

[542]   Transcript Day 1 Vol. 1 63:12-18.

[543]   *See supra* Parts IV.D.3 (November 2022) & IV.E.1.b (Alleged Throwing-to-the-Ground Incident).

[544]   Transcript Day 1 Vol. 1 26:9-10.

[545]   Transcript Day 1 Vol. 2 140:5-21.

[546]   Dr. Ruspoli provided all of her hand-written notes from the parties' therapy sessions, *see* Trial Exhibit 63 & 64, but the notes were generally cryptic and unhelpful; the Court did not rely heavily on those notes.

[547]   Transcript Day 1 Vol. 1 31:15-21 (Mr. Keen's testimony); Transcript Day 1 Vol. 2 55:17-56:3 (Dr. Ruspoli's testimony); *cf.* Transcript Day 2 Vol. 1 31:17-20 & 33:12-17 (Elaine testified that she had never heard Ms. Bowley accuse Mr. Keen of violence until she learned of Mr. Keen's arrest).

[548]   Transcript Day 1 Vol. 1 32:2-6 (Ms. Bowley testified that in their sessions with Dr. Ruspoli, Ms. Bowley complained about how Mr. Keen communicated with her, how Mr. Keen "wasn't attentive enough," and how Ms. Bowley believed Mr. Keen lacked boundaries with others, particularly other women); Transcript Day 1 Vol. 2 56:4-10 & 57:5-9 (Dr. Ruspoli noted that Ms. Bowley reported that Mr. Keen "was emotionally abusing her," in that "he would often neglect her or would be talking to other girls, not paying attention to her, . . . working late.  His boundaries around work were poor."  Ms. Bowley's "principal complaints" in therapy were that Mr. Keen "was neglectful, he wasn't taking care of her properly, and that she didn't feel loved.").

[549]   *See generally* Trial Exhibit 43; *see also* Transcript Day 1 Vol. 1 28:13-16.

violence by Mr. Keen against Ms. Bowley, but they do contain references—including Ms. Bowley's admission—to physical violence perpetrated by Ms. Bowley against Mr. Keen.[550]  Ms. Bowley claimed that the parties "spoke about everything [related to Mr. Keen's violence toward her] in person."[551]  The Court does not believe Ms. Bowley's testimony.

Ms. Bowley testified about her Trial Exhibit 48, which she alleged contains screenshots, taken on Ms. Bowley's phone, of her conversation with Victoria Payne, Mr. Keen's ex-girlfriend; those screenshots include other screenshots, allegedly taken by Ms. Payne of Ms. Payne's conversations with Mr. Keen.  Via that triple-hearsay, Ms. Payne allegedly recounted Mr. Keen's past abusive behavior toward her.[552]

But Dr. Ruspoli—who began treating Mr. Keen for depression in 2019[553]—denied that Mr. Keen had ever admitted in counseling that he had harmed Ms. Payne.[554]  And Mr. Keen testified that, prior to Ms. Bowley's report, no one else had ever accused him domestic violence; indeed, he had no criminal history at all.[555]  In view of Ms. Bowley's extensive falsehoods in this case and the fact that Ms. Bowley did not call Ms. Payne as a witness, the Court does not credit the authenticity of Exhibit 48 nor the veracity of Ms. Bowley's testimony about it.

On the other hand, the Court finds that Ms. Bowley was violent toward Mr. Keen.[556]  Mr. Keen credibly testified:  "Marissa's anger just gets completely out of control.  She would run at me and hit me, try and punch me, scratch me, whatever she could do."[557]  Mr. Keen stated that Ms. Bowley would never apologize for her violent

---

[550]     *See generally id.*; *see also* Transcript Day 1 Vol. 1 28:17-29:2 (Mr. Keen); Transcript Day 2 Vol. 2 100:22-102:8 (Ms. Bowley).

[551]     Transcript Day 2 Vol. 2 101:12-13 & 102:4.

[552]     Transcript Day 3 Vol. 1 105:6-109:10; *see also* Trial Exhibit 48.

[553]     Transcript Day 1 Vol. 2 61:18-62:2.

[554]     *Id.* at 63:13-2.

[555]     Transcript Day 1 Vol. 37:6-13.

[556]     *See supra* Parts IV.E.1.c (First Face-Scratching Incident), IV.E.2 (Return to London and Second Face-Scratching Incident) & IV.G (Spring 2023:  House Hunting and Preparing for Baby in London; a Second Temporary Separation).

[557]     Transcript Day 1 Vol. 1 32:7-33:1; *see also* Transcript Day 1 Vol. 2 142:13-143:19 ("[T]he same thing would happen each time. . .  [S]he'd run at 100 miles an hour at me, [l]iterally just running and swinging and like punching. . . .  I would normally . . . cower up against the wall or up against the door most of the time when these occasions happened.  Or if I could manage to get her wrist to stop her, then I would.  But on occasion of the 24th of January, she was punching and scratching everything. . . .  On one of the occasions of the violence, she threw an iPad at me and it smashed my elbow. . . .  The rest of the time was always punching and scratching.").

acts.[558]  Elaine once overheard Ms. Bowley shouting at and belittling Mr. Keen, saying "You're a[] f[***]g piece of s[**]t. . .  You're not a man.  You're a poor excuse for a man.  I should have stayed with my last partner.  He had proper money," while Mr. Keen simply told Ms. Bowley to "control [her] anger" and "[t]ake a breath."[559]  And even Ms. Bowley's mother, Maecel, acknowledged that she sometimes felt that she had to walk on eggshells around Ms. Bowley, stating, "You've got to watch what you say."[560]

The Court does not assign any weight to the fact that Mr. Keen's C100 application for child custody arrangements in U.K. court indicates "No" concerns about "[a]ny form of domestic violence or abuse," either by Ms. Bowley against the Baby or against Mr. Keen.[561]  As with the ICACU form, Mr. Keen credibly testified that he contributed little, if at all, to the form other than his signature because he was overwhelmed with the Baby's removal.[562]

### 2.    Alleged Emotional Abuse and Coercive Control

#### a.    Name Calling

Ms. Bowley alleges that Mr. Keen verbally abused her.  For example, Ms. Bowley and her witness, Ms. Piza, both testified that Mr. Keen frequently called Ms. Bowley a specific derogatory word—the "c" word—including via WhatsApp.  Ms. Piza testified repeatedly—in response to three different lines of questioning—that she saw the messages with her own eyes.[563]  Ms. Bowley also testified that she received text messages from Mr. Keen calling her the "c" word, although she acknowledged that—contrary to Ms. Piza's adamant testimony—he did not call her that name the night of August 2,

---

[558]    Transcript Day 1 Vol. 1 35:11-15.

[559]    Transcript Day 2 Vol. 1 26:20-27:1 & 31:20-33:11.

[560]    *Id.* at 87:17-21; *see also id.* at 84:21-85:16 (Maecel acknowledged that while she was in London, she had an argument with Ms. Bowley in which Ms. Bowley was angry and shouted at her, and Maecel stayed away from the flat for a day afterwards).

[561]    Trial Exhibit 13 DK0065 & DK0072-7; *see also* Transcript Day 1 Vol. 1 84:23-86:15.

[562]    Transcript Day 1 Vol. 1 79:18-85:15; *see also* Transcript Day 2 Vol. 1 49:16-51:15 (Elaine, who assisted with the form and works in the English Court system as a lay panel member in the Social Security Tribunal, has no special family law knowledge to aid in drafting the form).

[563]    Transcript Day 2 Vol. 2 41:15-24 (stating that, in their text exchange, Mr. Keen "would call [Ms. Bowley] a c[**]t all the time"); *id.* at 42:6-12 (stating she saw the "c" word in the parties' message chains "[a] few times"); *id.* at 47:4-12 (stating that Mr. Keen called Ms. Bowley a "c[**]t" over WhatsApp during their dinner on the night Mr. Keen was arrested); *id.* at 50:3-10 (reconfirming that she saw Mr. Keen call Ms. Bowley a "c[**]" over WhatsApp at dinner "with [her] own eyes").

2023.[564]  But Ms. Bowley's own evidence shows that Mr. Keen never once called Ms. Bowley the "c" word over WhatsApp during the entire course of their relationship.[565]  Mr. Keen used that specific obscenity only twice in the parties' WhatsApp message history:  (1) In September 2022, Mr. Keen appeared to be quoting another friend who used the word to describe Meghan Markle;[566] and (2) in November 2022, Mr. Keen used the word in reference to an unknown third party.[567]  In June 2023, Ms. Bowley referenced Mr. Keen calling her that word, presumably in person or over the phone, for which Mr. Keen apologized.[568]  But, after reviewing the parties' entire WhatsApp messaging history, the Court is not aware of a single instance of Mr. Keen calling Ms. Bowley that word in their approximately 13,000 messages.

In comparison, Mr. Keen candidly admitted to calling Ms. Bowley "terrible names" "on occasion," including "the 'C' word" and "a bitch"—he estimated "half a dozen to maybe ten over the course of the 12 months."[569]  The Court credits Mr. Keen's admission.

### b.    Jealousy and Control

The parties' relationship appears to have been marked by shared distrust:  each party repeatedly accused the other of cheating.  The Court concludes that the jealousy was mutual; if anything, Ms. Bowley accused Mr. Keen more frequently and flagrantly.

Relatedly, the Court does not believe Ms. Bowley's narrative that she was a victim of coercive control, that Mr. Keen was "relentless" in forcing her to remain in a relationship with him, or that she was afraid to stand up to him.[570]  The evidence indicates

---

[564]    *Id.* at 51:23-52:9.

[565]    *See generally* Trial Exhibit 43.

[566]    Trial Exhibit 43 MB000428-29 (Mr. Keen put quotation marks around the statement with the cuss word, then stated "My friends aren't fans of Meghan.").  On cross examination, Mr. Keen testified about the statement:  "It's a bit tongue and cheek."  Transcript Day 1 Vol. 1 93:8-21.

[567]    Trial Exhibit 43 MB000517.

[568]    *Id.* at MB000813.

[569]    Transcript Day 1 Vol. 1 86:19-87:15.

[570]    *See, e.g.*, Transcript Day 2 Vol. 2 65:20-66:23 (Ms. Bowley testified that Mr. Keen "[wa]s very, very relentless when it . . . came to getting back with me and refused to understand that I was not his girlfriend anymore"); *id.* at 66:25-68:11 (Ms. Bowley testified that she was not afraid to send assertive messages to Mr. Keen in early May 2023, accusing him of cheating only because he was away on a work trip).

that Ms. Bowley was incredibly assertive throughout the relationship—she generally appeared to be the instigator of conflict, and she was the only party to behave violently.

Ms. Bowley alleges that, when she, Maecel, and the Baby were in the car, Mr. Keen was driving over 90 miles per hour, "so fast that everyone else in the car, including [Maecel], begged [him] to slow down."[571]  Mr. Keen credibly acknowledged that he remembered "speeding in a car with Marissa and her mother in there," and Ms. Bowley saying "Dougie, just take a look at your speed," and filming him while he was speeding on the drive to Norfolk for holiday.  He acknowledged driving over the 20 mph speed limit but less than the 90 mph that Ms. Bowley alleged.[572]  Ms. Bowley did not seek to introduce any evidence, including video evidence, of the alleged speeding incident.

With respect to the Apple AirTag that Ms. Bowley found in the Baby's car seat, the Court finds that Elaine credibly testified that Mr. Keen was not involved in its placement and that her own motivation for placing it was benign.[573]

### 3.      Alleged Financial Abuse

Although Ms. Bowley included no mention of Mr. Keen's alleged financial abuse in her proposed findings of fact,[574] the police report of the August 3, 2023, incident documents that Ms. Bowley "stated she cannot earn her own money as she is unable to work in the UK but cannot leave as she isn't allowed to take her child to USA, therefore feels she is being financially controlled."[575]  And in her testimony, Ms. Bowley repeatedly emphasized that she lived on $20 per day that Mr. Keen would give her for food when she lived with him in London and that Mr. Keen would complain about her spending more.[576]

But the record is replete with evidence to the contrary:  it appears that the parties constantly ordered food, went shopping for clothing and accessories, and lived a generally

---

[571]    Transcript Day 1 Vol. 2 110:18-111:21; *see also* DV-110).

[572]    *See id.* at 111:17-21.

[573]    Transcript Day 2 Vol. 1 41:5-44:7.

[574]    *See generally* Respondent's Post-trial Brief.

[575]    Trial Exhibit 51 MB000869.

[576]    *See, e.g.*, Transcript Day 2 Vol. 1 102:12-25; Transcript Day 2 Vol. 2 60:7-61:16 (when asked about a message exchange on March 28, 2023, during which the parties were messaging about a dinner of "[p]istachio salmon with cheesy broccoli and potatoes" that Ms. Bowley was preparing in the London flat, Ms. Bowley testified that she could not recall whether the ingredients came out of her alleged $20 food allowance).

lavish lifestyle throughout their relationship—almost entirely funded by Mr. Keen.[577] And Ms. Bowley acknowledged that Mr. Keen gave her the use of his credit card.[578]

Furthermore, Ms. Bowley had ample financial resources of her own and the ability to use them. In addition to her income from her talent management work,[579] Ms. Bowley had amassed cash gifts from her U.S. baby shower, which she deposited into her U.S. bank account,[580] and she was able to use her U.S. bank card in London.[581] Moreover, Ms. Bowley acknowledged that she could have obtained Medi-Cal coverage (although she did not even attempt to obtain any U.S. health insurance).[582]

---

[577] *See, e.g.*, Trial Exhibit 43 MB000552 (Mr. Keen instructed Ms. Bowley "If you need anything else in [the Nike store] then get it."); *id.* at MB000554-54 (while travelling in Qatar, Ms. Bowley stated she did not have sandals, and Mr. Keen offered to buy some in the hotel shops); *id.* at MB000594 (Ms. Bowley texted Mr. Keen that she "calculated baby stuff and it came to £6k rounding up . . . with all the best stuff"); *id.* at MB000601 (Mr. Keen sent what appears to be a summary of his credit card statements amounting to a total of nearly £30,000 for a single month); *id.* at MB000616 (Mr. Keen asked Ms. Bowley where her cash was, and she responded: "Front zipper of my Prada purse . . . I think there's like 80 left"); *id.* at MB000620 (Ms. Bowley appears to be using Mr. Keen's Amex credit card and requesting a confirmation code); *id.* at MB000665 & MB000670 (Mr. Keen paid 2,500 GBP or USD for Ms. Bowley's Los Angeles baby shower); *id.* at MB000754 (Mr. Keen listing the expenses he had paid related to Ms. Bowley, beyond standard monthly expenses, in the month of April 2023—totaling approximately £16,450, and including £700 for Ms. Bowley's work weekend in New York); *id.* at MB000843 (Ms. Bowley noting to Mr. Keen that she had two of his credit cards in her possession); Transcript Day 1 Vol. 1 49:1-10 (Mr. Keen paid for the parties' four to five night trip to Marrakesh in Spring 2023); Transcript Day 1 Vol. 2 117:24-118:25 (for Christmas, Mr. Keen purchased a Chanel handbag for Ms. Bowley, which was something she had wanted and cost "about 4,000 pounds").

[578] Transcript Day 2 Vol. 2 57:25-58:7; *see also supra* n.577 (listing multiple exchanges involving Ms. Bowley using or possessing Mr. Keen's credit card).

[579] *See supra* Part IV.I.4.b (Ms. Bowley Was Able to Work and Earn Money in London).

[580] While she was in California, Ms. Bowley hosted a baby shower for her family and friends. *See* Transcript Day 1 Vol. 1 47:16-17. Ms. Bowley requested cash gifts instead of physical gifts and intended to use the cash to purchase baby goods in London. *See* Transcript Day 2 Vol. 1 83:7-84:3 (Maecel stated that Ms. Bowley requested monetary gifts for her baby shower "so she [could] get whatever she like[d]" and intended to bring the cash gifts back with her to London); Transcript Day 1 Vol. 1 48:19-25 (Mr. Keen testified that, with respect to her Los Angeles baby shower, Ms. Bowley requested cash gifts "as opposed to presents because taking all the presents back to the U.K. would be a nightmare"). Ms. Bowley deposited the cash gifts into her U.S. bank account. *See* Transcript Day 2 Vol. 1 96:17-25.

[581] Transcript Day 2 Vol. 2 56:4-9.

[582] Transcript Day 2 Vol. 1 98:8-13 (Ms. Bowley testified that she could have gotten Medi-Cal but not any other insurance, but she did not attempt to get any other insurance "because you have to show proof of income"); *see also* Transcript Day 2 Vol. 2 132:10-24 (Ms. Bowley testifying that she never got U.S. insurance for her work with Ms. Piza because she would have had to show proof of income and she was not working full time).

K.    **Dr. Favaro's Expert Report**

Ms. Bowley engaged an expert psychologist, Dr. Peter Favaro, to support her grave risk defense.[583]   Dr. Favaro conducted an in-home interview and observation of Ms. Bowley; he did not include Mr. Keen in his study.[584]

Dr. Favaro explained that he "do[es] not assess credibility."[585]   Rather, he described his report as an "if-then" statement:  if the trier of fact—the Court—finds Ms. Bowley's self-reported statements to be credible, then Dr. Favaro suggests a formulation for understanding them and applying the law.[586]

Dr. Favaro's "if-then" expert opinions are as follows:

(1)    "if the allegations made by Ms. Bowley are true, then she is the victim of severe domestic violence, both in the form of battery, physical violence, and in the forms of intimate partner violence including coercive control"; and

(2)    "if those allegations are supported and [Ms. Bowley] is found credible, the child is at grave risk for serious psychological harm because of the connection in the literature between children, even infants, who are reared in the presence of intimate partner violence and the sequelae to being in that environment which include altered brain development, . . . impaired cognitive development, [and] social and emotional dysfunctionality."[587]

Dr. Favaro's opinion also encompassed what he described as "intimate partner violence" or "coercive control," which he described as "us[ing] harassment, manipulation, humiliation, . . . as a means of controlling the power dynamic in the context of the relationship."[588]   Dr. Favaro noted that "[t]he victim of that kind of intimate partner violence often shows behaviors of fear, intimidation, confusion about whether or not to stay or leave in the relationship with the hope that the relationship will improve or get better,"[589] and that there must be an element of "entrapment"; *i.e.*, "[m]anipulating

---

583    *See generally* Trial Exhibit 61 (Favaro Report).

584    Transcript Day 3 Vol. 2 51:8-53:4.

585    *Id.* at 53:5-54:1.

586    *See id.* at 54:7-17.

587    *Id.* at 56:6-18; *see also* Trial Exhibit 61.

588    *Id.* at 57:19-58:11.

589    *Id.* at 58:12-15.

the power and control dynamic to make the victim feel like there's no escaping the relationship."[590]  Dr. Favaro explained that Ms. Bowley's reports of "multiple instances of Mr. Keen calling her derogatory names, . . . blocking her from leaving the country using legal means, . . . shouting at her, pushing her, . . . making her feel as if she's a second-class citizen in the relationship," if true, constitute coercive control.[591]  But Dr. Favaro again caveated that those findings are subject to the Court's determination of "whether or not [the allegations are] exaggerations or whether or not they should be cause for concern in the context of this particular litigation."[592]

Dr. Favaro testified that any statement in his report that is styled in italics is "verbatim from [Ms. Bowley]."[593]  Ms. Bowley's statements to Dr. Favaro, as reproduced in his report, are rife with specific psychotherapy terms of art; for example, "He was manipulative and used tactics like reactive abuse against me" and "I was in a trauma bonded relationship."[594]  When questioned about Ms. Bowley's use of those terms, Dr. Favaro testified that he believed that Ms. Bowley conducted a lot of research on domestic violence.[595]

The Court is extremely sensitive to the plight of victims of domestic violence and recognizes that there are rarely if ever "perfect victims" for the sake of legal analysis.  But in this case, the Court concludes that Ms. Bowley was clearly not a victim.  The Court finds that Ms. Bowley's allegations are completely fabricated, so Dr. Favaro's analysis does not apply and the Court does not consider it.

# V.  ANALYSIS

## A.  Mr. Keen Has Met His Pleading Burden:  The Baby Was Habitually Resident in London

The parties agree that, of the three *prima facie* case prongs, only habitual residence is at issue here.[596]  But, for the sake of completeness, the Court notes that Mr. Keen has

---

[590]     *Id.* at 59:3-7.

[591]     *Id.* at 58:19-59:4.

[592]     *Id.* at 60:11-15.

[593]     *Id.* at 74:11.

[594]     Trial Exhibit 61 MB000912.

[595]     Transcript Day 3 Vol. 1 82:16-83:7.

[596]     Answer ¶ 9 ("It is admitted that the Mother and Father share joint rights of custody to the child by operation of law."); *see also* Respondent's Post-Trial Brief ¶ 155 ("The touchstone

substantially surpassed his pleading burden and has proven each of the three prongs.  The declaration of Mr. Keen's expert on U.K. law adequately shows that the Baby's removal from the U.K. breached Mr. Keen's rights of custody under U.K. law and that Mr. Keen actually exercised those custody rights at the time of the Baby's removal under U.K. law.[597]  The Court analyzes the habitual residence prong below.

1.      **"Habitual Residence" is a Fact-Focused Inquiry**

The determination of a child's "habitual residence" is "fact-focused":  it is described as "'the family and social environment in which [the child's] life has developed,'" and it depends upon "'some degree of integration by the child in a social and family environment.'"  *Monasky*, 589 U.S. at 77 (quoting 1980 Conférence de La Haye de droit international privé, Enlèvement d'enfants, E. Pérez-Vera, Explanatory Report in 3 Actes et documents de la Quatorzième session, p. 445, ¶ 66 (1982) (Pérez-Vera); *OL v. PQ*, 2017 E. C. R. No. C–111/17, ¶ 42 (Judgt. of June 8)).  A child's "habitual residence" is commonly understood to be "[t]he place where a child is at home, at the time of removal or retention."  *Id.*

"[L]ocating a child's home is a fact-driven inquiry," so "courts must be 'sensitive to the unique circumstances of the case and informed by common sense.'"  *Id.* at 78 (quoting *Redmond v. Redmond*, 724 F.3d 729, 744 (7th Cir. 2013)).  "Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations."  *Id.*  "No single fact, however, is dispositive across all cases."  *Id.*  For example, the Ninth Circuit has recently held that a young child's "habitual residence" may be where the facts indicate that the parents "made their home."  *See, e.g.*, *Kenny v. Davis*, 2022 WL 501625, at *1 (9th Cir. Feb. 18, 2022).  With respect to very young children, "[a]n infant's mere physical presence [in a country] is not a dispositive indicator of [the] infant's habitual residence."  *Monasky*, 589 U.S. at 81.  "[F]or instance, [if] an infant lived in a country only because a caregiving parent had been coerced into remaining there," the Court should consider those circumstances.  *Id.* at 78.

In sum, "[t]here are no categorical requirements for establishing a child's habitual residence—least of all an actual-agreement requirement for infants."  *Id.* at 80-81 (holding that the Petitioner did not need to prove that an "actual agreement" existed between the parents on where to raise their then-two-month-old child in order to establish the child's "habitual residence" for the purpose of an ICARA petition); *see also Kenny*,

---

of this case is the determination of the child's habitual residence."); *see generally id.* (not disputing Mr. Keen's exercise of his custodial rights at the time of removal).

[597]     *See generally* Morley Declaration.

2022 WL 501625, at *2 (the "parents need not actually agree to move a child's habitual residence"). While an actual agreement between the parents is not required, when the court finds that the parents did, at one point, agree upon a child's home country and, later, did not share an actual agreement to change a child's habitual residence, that finding may be largely dispositive. *See, e.g.*, *Farr v. Kendrick*, 824 F. App'x 480 (9th Cir. 2020) (upholding a district court's finding that "the parents did not have a shared, settled intent to abandon the United States as their habitual residence when they moved to Mexico").

While caselaw does not set many clear rules for deciding these types of cases, it does strongly prefer a finding that the child had a habitual residence ***somewhere***: the Supreme Court has opined that finding an infant to be ***without*** a habitual residence at the time of removal would be inappropriate because it would remove the child from the Hague Convention's reach. *See Monasky*, 589 U.S. at 82 ("We doubt, however, that imposing a categorical actual-agreement requirement is an appropriate solution, for it would leave many infants without a habitual residence, and therefore outside the [Hague] Convention's domain."). *But cf. In re A.L.C.*, 607 F. App'x 658 (9th Cir. 2015) (pre-*Monasky* case cited by Ms. Bowley, holding that a nine-month-old infant was too young to have a "habitual residence" when the parents never shared an intent, such that the Hague Convention did not apply).

In this case, the facts unmistakably show that the Baby was habitually resident in the U.K. before Ms. Bowley removed him to the U.S., and that removal was perpetrated against Mr. Keen's wishes and in violation of his rights as the Baby's father.

## 2. The Parties Actually Agreed to Raise the Baby Together in London

As discussed above, an actual agreement between the parents regarding the child's habitual residence is not required. *See Monasky*, 589 U.S. at 81-82. But when the parents ***did***, at one point, agree upon a child's home country and, later, ***did not*** share an actual agreement to change the child's habitual residence, that finding may be dispositive. *See, e.g.*, *Farr v. Kendrick*, 824 F. App'x 480 (9th Cir. 2020).

The Court finds that that scenario occurred between the parties here: Mr. Keen and Ms. Bowley agreed to raise the Baby in London, but they did not subsequently agree for Ms. Bowley to remove him permanently to California.[598] Ms. Bowley was not coerced into that agreement.[599] The two instances in which the parties actually separated and

---

[598]   *See generally supra* Parts IV.I.1 (The Baby Lived in London Before He Was Removed) & IV.I.2 (The Parties Planned to Raise the Baby in London).

[599]   *See supra* Parts IV.C (Pre-Pregnancy Events), IV.D (Early Pregnancy:  October to December 2022), IV.E (January 2023), IV.F (Ms. Bowley's Winter 2023 Stay in California:  A

entertained the idea of Ms. Bowley moving to California with the Baby were temporary, and they occurred before the Baby was born;[600] by the time of the Baby's birth and as of the time of his removal, the parties had agreed to raise the Baby in London together.[601] And to the extent that they were considering permanently separating in the final days of their relationship, they had already commenced a custody determination under U.K. law.[602]

Ms. Bowley's decision to remove the Baby to California was therefore unilateral and contrary to Mr. Keen's rights and wishes.

### 3.    Ms. Bowley's Habitual Residence Was the London Flat

Additionally, although this conclusion weighs less heavily than the actual agreement between the parties, the Court concludes that—except for the two, temporary separations discussed above[603]—Ms. Bowley was in a partnered (albeit appallingly dysfunctional) relationship with Mr. Keen from the first week of their relationship until a few days before the Baby's removal.[604] Ms. Bowley's own habitual residence was the London flat during that time.[605]

Having carefully reviewed all of the testimony and other information admitted into evidence, the Court credits Mr. Keen's explanation of Ms. Bowley's behavior:  when Ms. Bowley was upset with Mr. Keen, she would threaten to move to Los Angeles,[606] but the parties generally remained in a partnered relationship that was based out of their

---

Temporary Separation), IV.G (Spring 2023:  House Hunting and Preparing for Baby in London; a Second Temporary Separation), IV.H (The Baby's Two Months in London), & IV.J (Additional Facts Pertaining to Grave Risk).

[600]    *See supra* Parts IV.F. (Ms. Bowley's Winter 2023 Stay in California:  A Temporary Separation) & IV.G (Spring 2023:  House Hunting and Preparing for Baby in London; a Second Temporary Separation).

[601]    *See supra* Parts IV.H (The Baby's Two Months in London) & IV.I (Additional Facts Pertaining to Habitual Residence).

[602]    *See supra* Parts IV.H.4 (Form of Undertaking and the Baby's Removal) & IV.I.3 (The Parties Had Already Commenced a Custody Determination Under U.K. Law When Ms. Bowley Removed the Baby).

[603]    *See supra* Parts IV.F (Ms. Bowley's Winter 2023 Stay in California:  A Temporary Separation) & IV.G (Spring 2023:  House Hunting and Preparing for Baby in London; a Second Temporary Separation).

[604]    *See supra* Part IV (Findings of Fact).

[605]    *See generally supra* Part IV.I.4 (Ms. Bowley Resided in the London Flat with Mr. Keen).

[606]    Transcript Day 1 Vol. 2 88:11-96:14.

shared home in London until Mr. Keen's arrest days before Ms. Bowley removed the Baby to the United States.

**B.     Ms. Bowley Has Failed to Meet Her Defensive Burden:  There is No Grave Risk to the Baby's Return**

As discussed above, the Court does not find Ms. Bowley's allegations of physical violence to be credible.  Rather, the only physical violence between the parties was perpetrated by Ms. Bowley against Mr. Keen.[607]

As with the claims of physical violence, the Court does not find Ms. Bowley's allegations of other abuse or coercive control to be credible.  To the contrary, Mr. Keen appears to have pampered Ms. Bowley, and Ms. Bowley appears to have taken advantage of Mr. Keen's largess, and she attempted to manipulate Mr. Keen, his family, her expert, and the Court.[608]

To the extent that Mr. Keen did call Ms. Bowley names or shout at her—which, of course, was absolutely inappropriate—the Court concludes that Ms. Bowley treated Mr. Keen the same way or worse, that she was frequently the instigator of arguments, and that she was not a victim in the relationship.[609]  To the extent that Mr. Keen was jealous and suspicious, the Court concludes that Ms. Bowley was as well, as by accusing Mr. Keen of cheating on multiple occasions.[610]  To the extent that Ms. Bowley desired to leave the flat or the U.K., she had the means to do so.[611]

Because the Baby was habitually resident in the U.K. in August 2023, Ms. Bowley removed him in violation of Mr. Keen's rights, and Ms. Bowley has no valid grave risk defense, the Baby must be returned to London.

**C.     Return Mitigation**

The Court may, within its discretion, order mitigation measures to be taken upon the return of the Baby to the United Kingdom.  *See Golan*, 596 U.S. at 677-82.  Here, the Court holds that there is no such "grave risk" to mitigate.  Nonetheless, the Court does—within its discretion—consider what measures might ensure that the Baby's return

---

[607]     *See supra* Part IV.J.1 (Alleged Physical Violence).

[608]     *See generally supra* Part IV (Findings of Fact).

[609]     *See supra* Part IV.J.2 (Alleged Emotional Abuse and Coercive Control).

[610]     *See supra* Part IV.J.3 (Alleged Financial Abuse).

[611]     *See supra* Parts IV.I.4.b (Ms. Bowley Was Able to Work and Earn Money in London) & IV.J.3 (Alleged Financial Abuse).

is as smooth and drama-free as possible.  *See id.* at 677 (the question of "grave risk" is separate from the question of ameliorative measures).

Ms. Bowley testified that, if the Court were to order the Baby's return to London, she would go with him because "[she is] the primary caregiver" and the Baby—now one-year-old—"would be in a very unfamiliar place with unfamiliar people."[612]  The Court considers those statements likely to be true, but only because Ms. Bowley—by removing the Baby at two months of age under completely fabricated pretenses—made them so. However, the Baby is older now and is less reliant on his mother than he was when he was a newborn.  Indeed, Ms. Bowley recently agreed to allow Mr. Keen to have the Baby for an overnight visit in Orange County.[613]  Therefore, the Baby need not stay only or primarily with Ms. Bowley.

According to the August 3, 2023, police report, the parties agreed that Ms. Bowley and the Baby would stay in the London flat before they departed to Los Angeles, and again after their expected returned in early September 2023.[614]  And during the trial, Mr. Keen opined, on cross-examination, that for Ms. Bowley and Mr. Keen both to accompany the Baby on the flight to the U.K., rather than for Mr. Keen or Elaine (without Ms. Bowley) to make that trip with the Baby, would be in the Baby's best interest.[615]  Mr. Keen offered that Ms. Bowley and the Baby could live in his flat initially upon their arrival in the U.K.[616]  The Court concludes, therefore, that Ms. Bowley should be allowed to stay in Mr. Keen's flat *if necessary* for an initial acclimatization period, and Mr. Keen should be ordered to stay away if and while Ms. Bowley is residing there.

## VI.  DISPOSITION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1.     The instant Petition of Douglas Raymond Aggio Keen for the return of Baby A.K.B.K. is **GRANTED**.

2.     Respondent Marissa Whitney Bowley is **DIRECTED** to return Baby A.K.B.K. to the United Kingdom—the Baby's country of habitual residence—pending

---

[612]     Transcript Day 3 Vol. 1 114:9-24.

[613]     *See* Status Report [ECF No. 61].

[614]     Trial Exhibit 51 MB000872-73.

[615]     Transcript Day 1 Vol. 2 113:8-10.

[616]     *Id.* at 113:16-20.

the determination of a custody arrangement under the governance of the U.K. family court.

3.      The Orange County District Attorney is **DIRECTED** forthwith to return to Ms. Bowley and to Baby A.K.B.K. their respective passports to facilitate their travel to the U.K. in accordance with this Order.

4.      Ms. Bowley is **DIRECTED** to deliver the Baby into Mr. Keen's custody in the U.K. on or before July 31, 2024, unless and until the U.K. family court issues a superseding order or unless the parties reach an alternate, mutually agreeable arrangement.

5.      Mr. Keen and Ms. Bowley are **DIRECTED** thereafter to share equal custody of the Baby,[617] including daytime and nighttime hours, unless and until the U.K. family court issues a superseding order or unless the parties reach an alternate, mutually agreeable arrangement.

6.      If Ms. Bowley desires to remain in the U.K. during the pendency of the custody determination under U.K. law and if she is unable to secure adequate accommodations by the deadline to return the Baby, then Mr. Keen is **DIRECTED** to permit Ms. Bowley to reside in Mr. Keen's London flat for the first 30 days that she and the Baby are in London.  Mr. Keen is **DIRECTED** to vacate the premises during the time that Ms. Bowley is residing there unless the parties reach an alternate, mutually agreeable arrangement.

7.      Ms. Bowley's "motion for judgment under 22 U.S.C. [§] 9003"[618] is **DENIED**.

8.      This Order shall constitute the Court's Judgment under Rule 58 of the Federal Rules of Civil Procedure.

---

[617]    With this provision, the Court does not improperly consider the merits of the underlying custody dispute.  *See Monasky*, 589 U.S. at 72.  Rather, the Court attempts to enforce the pre-removal *status quo* pending the adjudication of the custody dispute by U.K. courts.  *See id.*

[618]    Transcript Day 2 Vol. 2 103:13-105:1.

9.      The Clerk is **DIRECTED** to close this case.

**IT IS SO ORDERED.**

Dated:      July 1, 2024

John W. Holcomb
UNITED STATES DISTRICT JUDGE